[No. A018195. First Dist., Div. Two. Oct. 26, 1984.]

CHRISTOPHER ILLINGWORTH, Plaintiff and Appellant, v. STATE BOARD OF CONTROL, Defendant and Respondent.

COUNSEL

David C. Phillips, Charles J. Wisch and Goldstein & Phillips for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Marvin E. Goldsmith, Assistant Attorney General, James R. Schwartz and B. Franklin Walker, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**SMITH, J.**—California's victims of violent crime act (Act) (Gov. Code, §§ 13959-13969.1)[1] provides a scheme of monetary assistance to victims of certain crimes committed either in the state or while the victim is temporarily outside the state but only where the victim is a California "resident" at the time the crime is committed (§ 13960, subd. (a)).[2] This appeal from a judgment of the superior court denying Christopher Illingworth administrative mandate relief (Code Civ. Proc., § 1094.5) against a final administrative decision of the State Board of Control (Board), presents a single issue: May the Board, despite a sufficient factual showing necessary to establish residence at the time of the crime, deny assistance to an applicant solely because he or she was at that time living in this country under a temporary, nonimmigrant visa?

---

[1] All undesignated section references in this opinion are to the Government Code unless the context indicates otherwise.

[2] In pertinent part, subdivision (a) of section 13960 defines a "victim" as "any of the following *residents of the State of California*, . . . [¶] (1) A person who sustains injury or death as a direct result of a crime." (Italics added.)

Subdivision (c) of the same section defines "crime" in part as one of certain specified crimes or public offenses "which result[] in injury to a *resident of this state,* including such a crime or public offense, wherever it may take place, when the *resident* is temporarily absent from the state. . . ." (Italics added.)

## BACKGROUND

Appellant Illingworth, a citizen of Great Britain, arrived in New York on March 12, 1977, and 10 days later began residence in this state at the apartment of Alice Nusbaum in San Francisco. Appellant had met Ms. Nusbaum some two years earlier, and they had subsequently corresponded and visited, discussing the possibility of his moving permanently to San Francisco and of their being married. Because Ms. Nusbaum lived in San Francisco, appellant decided to change his residence to that city and had expressed that resolve to his family and friends in Great Britain before leaving.

Although he planned to establish permanent residence in San Francisco, appellant did not apply for a resident visa. Having learned through the United States Embassy in London that such application would almost certainly be denied without a sponsor, and since he had no relatives living in this country or offer of employment here, he decided instead to enter upon a nonimmigrant visitor visa.[3] Illingworth also intended that upon his entry into the United States he would find employment and then apply for adjustment of his status to that of a permanent resident.[4]

Appellant accordingly applied for and entered under a six-month visitor visa and sought employment soon after arriving in San Francisco on March 22. Hindered at first by lack of documentation authorizing employment, he worked at two temporary jobs for a total of five weeks and was paid in cash. Then, using the name Alan Nusbaum, he secured a job with an Oakland marketing research firm, where he worked for about two months on a payroll basis with deductions for state disability and social security. During this time, he also discussed further with Ms. Nusbaum his plans to stay, obtained library privileges, and requested and received the forms needed to apply for adjustment of status.

---

[3]Section 1201(a)(2) of title 8 of the United States Code provides that a consular officer may issue "to a nonimmigrant who has made proper application therefor, a nonimmigrant visa, which shall specify the classification under section 1101(a)(15) of this title of the nonimmigrant, the period during which the nonimmigrant visa shall be valid, and such additional information as may be required."

Section 1101(a)(15)(B) of the same title classifies, as a "nonimmigrant alien," an alien ". . . having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure[.]"

[4]Section 1255(a) of title 8 of the United States Code states: "The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed."

Appellant's plans were cut short, however, when he was gravely and permanently injured in a motorcycle accident, on July 1, while on vacation in Yosemite National Park. Unknown to appellant, the driver of a motorcycle on which he was a passenger was intoxicated. The driver lost control as he attempted to pass another vehicle, and the motorcycle ran off the road causing appellant massive internal injuries and a fractured vertebra which left him a paraplegic, permanently paralyzed below the point of fracture. The driver was later convicted, apparently for drunk driving,[5] based on the incident.

Appellant was hospitalized for nearly two months and afterward required continuing medical and other health care. He had not previously intended to return to Great Britain but decided to do so in order to avail himself of needed low cost health and medical services.

On May 1, 1978, appellant applied for assistance under the Act and, by a letter dated May 6, 1981, was informed by the Board that his application had been denied. He thereafter requested, by way of application for reconsideration (§ 13969.1, subd. (b)), findings of fact and was informed, in a Board letter of August 19, that his application had been denied based on "residency."

A petition for writ of mandate was filed in superior court on November 30,[6] in which appellant argued that the Board's denial on grounds of residency was not supported by the evidence and was therefore an abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (c).) An alternative writ issued, and a show-cause hearing was held on February 1, 1982. Peremptory writ was denied and the alternative writ discharged by a judgment entered on May 27. Timely notice of appeal was filed on June 7.

## APPEAL

The declared legislative purpose of the Act is to assist crime victims who are California "residents,"[7] yet the Act itself does not define who is a

---

[5]Section 13960, subdivision (c)(2), of the Act defines, as a "crime" (formerly "crime of violence") thereunder, driving under the influence (Veh. Code, §§ 23152, 23153 [formerly §§ 23102, 23101]), where such offense results in injury or death. (See also § 13960, subd. (b), defining "injury.") There is no dispute that the accident and resultant injury fell within the purview of the Act.

[6]Though the record is incomplete in this regard, respondent Board represents that it finally denied the application for reconsideration on October 31. Accepting that date for the Board's final decision, appellant's November 30 petition for writ review was timely. (§ 13969.1, subd. (c)(2).)

[7]Section 13959 provides in part that "[i]t is in the public interest to assist *residents of the State of California* in obtaining restitution for pecuniary losses they suffer as a direct result of criminal acts. . . ." (Italics added.)

California resident. Formulation of a definition has by implication been left to the Board, which is vested with authority under the Act "to make all needful rules and regulations consistent with the law for the purposes of carrying into effect [the Act's] provisions . . . ." (§ 13968, subd. (a).)

Pursuant to that authority, the Board has promulgated this regulation: "Resident of California . . . means . . . an alien residing in California who is in possession of a document issued by the United States Immigration and Naturalization Service [hereafter INS] which authorizes such person to reside in this state." (Cal. Admin. Code, tit. 2, § 649.12, bracketed material added.) The Board accepts the construction of our state courts of "residence" (§§ 243-244) to mean "domicile" (see, e.g., *Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497]; *Fenton* v. *Board of Directors* (1984) 156 Cal.App.3d 1107, 1113-1114 [203 Cal.Rptr. 388]). We assume in the following discussion what both parties in this case accept without question, that residence under the Act requires the same union of act and intent traditionally required to create a domicile of choice.[8]

The language cited above from the Board's regulation appears to establish appellant's residency under the Act, for he is, at least in a literal sense, "an alien *residing* in California who is in possession of a document issued by the [INS] which authorizes [him] to *reside* in this state." (Italics added, Cal. Admin. Code, tit. 2, § 649.12.) However, in keeping with the parties' acceptance of the word "residence" as meaning "domicile," we interpret the words "residing" and "reside" in the same sense. This is unquestionably the Board's interpretation of its own regulation and hence entitled to judicial deference (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161]).

The Board, therefore, appears to have acted in accord with its own regulation in this case, and, while we are not asked to pass upon the validity of that regulation as an exercise of administrative discretion (see fn. 10, *post*; see also *Ontario Community Foundation, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811, 816-817 [201 Cal.Rptr. 165, 678 P.2d 378]),

---

[8]Section 243 states, "Every person has, in law, a residence."

Section 244 states, in relevant part: "In determining the place of residence the following rules shall be observed:

"(a) It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose.

"(b) There can only be one residence.

"(c) A residence cannot be lost until another is gained.

". . . . . . . . . . . . . . . . . . . . . . .

"(f) The residence can be changed only by the union of act and intent."

resolution of this case nonetheless requires us to assess whether the Board's action as to appellant was consistent with the Act.

## I

The Board advances a single theory in support of both its decision and the trial court's judgment. While conceding that appellant *factually demonstrated* the necessary union of act and intent ordinarily sufficient to establish residence or domicile, the Board nevertheless contends that appellant, as an alien who at the time in question was lawfully in this country on a visitor's visa which in effect conditioned entry on an expressed intent not to abandon his foreign residence or domicile, lacked the *legal capacity* to establish a California domicile.[9] *Anselmo* v. *Glendale Unified School Dist.* (1981) 124 Cal.App.3d 520 [177 Cal.Rptr. 420], is cited as authority for that position.

Appellant first contends that his visa status and the legality or illegality of his residence as tested by federal immigration law are not determinative factors, and that the court's judgment is therefore contrary to the Act as interpreted in *Cabral* v. *State Bd. of Control* (1980) 112 Cal.App.3d 1012 [169 Cal.Rptr. 604]. Second, relying on *Plyler* v. *Doe* (1982) 457 U.S. 202 [72 L.Ed.2d 786, 102 S.Ct. 2382], and *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194], he contends that the Board's classification of temporary visa holders as ineligible for assistance is an unjustified alienage-based discrimination which violates federal and state equal protection guarantees.[10]

We begin with *Cabral* v. *State Bd. of Control, supra,* the only published decision to have addressed the effect of alien status on the Act's residency requirement. The two appellants in *Cabral* were undocumented aliens who had entered the United States illegally and had been living in the Los Angeles area for a year or more when each suffered severe head injuries in unrelated assaults. Neither had at the time been subject to a deportation order. They each later filed for assistance under the Act but, as in our case, had their applications denied by the Board on grounds that they had failed to establish residency. In consolidated appeals from denials of administra-

---

[9]At the hearing in superior court, counsel for the Board offered that, had it not been for appellant's status as a temporary visa holder, his application would have been granted. In its respondent's brief on appeal, the Board in effect confirms that position by expressly abandoning any argument that the judgment is supportable based on weaknesses in appellant's factual showing and by treating the judgment as one "based upon a preclusion from establishing residency as a matter of law."

[10]Appellant raises no facial challenge to the Board's regulation and, of course, none to the statute, which does not define the term "residence."

tive mandamus relief, they challenged the validity of the same regulation involved in this case, contending that the Board had acted contrary to law and in violation of state and federal equal protection guarantees by, in effect, requiring "legal" or "lawful" residence as opposed to mere residence in the domiciliary sense. (112 Cal.App.3d 1012, 1013-1015.) The issue was whether the appellants' status as aliens *illegally* in this county limited their legal capacity to change their respective domiciles from Mexico to California.

The Court of Appeal in *Cabral,* less one dissenter, concluded that the regulation's requirement of "lawful" residence exceeded the Board's authority under the Act, declared the regulation invalid on that ground and thus found it unnecessary to reach the equal protection arguments. (112 Cal.App.3d 1012, 1014, 1017.) The court assumed, as we do, that the Government Code section 244 definition of domicile (see fn. 8, *ante*) and domiciliary intent as formulated in the Restatement Second of Conflict of Laws (§ 18) were necessary for establishing residence under the Act. However, the court in *Cabral* concluded that neither the code nor the Restatement imposed a requirement of *legal* residence. The court further noted that the Restatement concept of legal capacity (Rest.2d Conf. of Laws, § 15) was dependent on the legal capacity to contract rather than on any incapacity flowing from federal law. (*Id.,* at pp. 1016-1017.)

*Cabral* holds, at the very least, that an alien is not precluded from establishing residence under the Act merely because of his or her undocumented status. Read more broadly, it suggests that failure to comply with federal immigration law is not a bar to residence, and hence eligibility. Nevertheless, the case at bar presents a somewhat different question, for although appellant may have been violating federal law by holding employment without INS authorization, *such a violation was not the ostensible basis for his ineligibility*. Rather, the Board argues that it premised ineligibility on his implied promise, as a nonimmigrant visa holder, not to seek a California domicile during the six-month term of his visa. (See discussion in *Elkins* v. *Moreno* (1978) 435 U.S. 647, 665 [55 L.Ed.2d 614, 628, 98 S.Ct. 1338].)[11]

---

[11]The implied promise or legal disability doctrine is, of course, a fictional limitation on domicile, for an alien might, as in the case of appellant Illingworth, falsely state an intent not to abandon an existing domicile while fully intending to do just that, and may later demonstrate factually the necessary union of act and intent. The theory also operates mechanically. For example, a visa applicant might initially intend in good faith not to relinquish a foreign domicile, later change his or her mind, and yet be artificially bound by the former intent for the term of the visa. Then, at the instant that the visa (and with it the promise) expires, the disability vanishes, and domicile is legally possible even though the alien may have overstayed the visa term in violation of federal law. (See, e.g., *Seren* v. *Douglas* (1971) 30 Colo.App. 110 [489 P.2d 601, 602-603]; see generally Wildes & Grunblatt, *Domicile for Immigration and Federal Gift and Estate Tax Purposes—Is A Harmonious Rule Possible?* (1983) 21 San Diego L.Rev. 113.)

The question then becomes: Did our Legislature intend that the implied promise inherent in entry under a nonimmigrant visa operate as a legal disability on residence under the Act even though, as the court in *Cabral* concluded, no disability based on undocumented alien status was intended? We say no, and for two principal reasons.

First, like the *Cabral* court, we find no sign of an intent to distinguish between lawfully and unlawfully resident aliens, much less an intent to place legally admitted nonimmigrant visa holders at a disadvantage over undocumented aliens who might never in the first place have attempted compliance with immigration laws.

The Board insists that the holding in *Anselmo* v. *Glendale Unified School Dist., supra,* 124 Cal.App.3d 520, announces a blanket policy of denying state residence status to aliens who hold nonimmigrant visas. It clearly does not. Respondents in *Anselmo* were a husband and wife who had entered this country from Italy pursuant to nonimmigrant tourist visas, purchased a home in Glendale, and then sought to enroll their child in public school but were denied their application by the school district based on nonresidency. (124 Cal.App.3d at p. 522.) Reversing the grant of a preliminary injunction, the appellate court concluded that the child had been properly denied admission based on a statutory definition of "residency" that specifically incorporated a reference to federal law. Because the parents' visa status was, as here, expressly conditioned on maintenance of a foreign domicile, the child's derivative residency had not been established.[12] (*Id.,* at pp. 522-523.)

The holding in *Anselmo* clearly depended on the statute's reference to federal law and thus must be distinguished from this case, where the statute is silent as to the definition of residence. Moreover, the Act's silence is further reason to believe that no limitations based on visa status were intended or authorized since such limitations, as *Anselmo* illustrates, would likely be spelled out explicitly in the statute if intended.[13] (See fn. 12, *ante.*)

---

[12]Then, as now, Education Code section 48200 provided in part that "[r]esidency, for the purpose of attendance in the public schools, shall be determined by Section 17.1 of the Welfare and Institutions Code," which in turn provided in part that, "to the extent not in conflict with federal law," the residence of a minor child was to be determined by the residence of a parent with whom the child maintained "his or her place of abode." (Welf. & Inst. Code, § 17.1, subd. (a).)

[13]The Board suggests that the *Anselmo* decision rests on the compulsion of federal law supremacy and thus that, irrespective of state law policy, federal law might require state law conformity with immigration law disabilities on residence. We reject that argument and analyze the question of disability as a matter of state law policy. To begin with, we have already concluded that *Anselmo* rests on statutory interpretation, not on an overriding state

We note that in the four years since it was announced in *Cabral* that the Act does not authorize a requirement that aliens be "lawful" residents of California, there has been no contrary response from the Legislature despite major changes in the foundational residency requirements for other assistance programs, the effect of which has been to require adherence to federal immigration standards.[14]

A second reason for our conclusion is that, in those instances of California law discussed above where adherence to federal law is required, the statutes make no apparent distinction between undocumented aliens generally and documented aliens who are subject to a federal residency disability. Thus, given the *Cabral* rule as to undocumented aliens,[15] it is unlikely that a different legislative intent applies to holders of nonimmigrant visas.

▪ We therefore hold that an alien who otherwise satisfies the test of residency under the Act does not lack the legal capacity to establish residency by reason of his or her status as a nonimmigrant visa holder (8 U.S.C. § 1101(a)(15)(B)). Courts of other jurisdictions have drawn similar conclusions (see, e.g., *Nicolas* v. *Nicolas* (Fla.App. 1984) 444 So.2d 1118, 1120-1121; *Bustamante* v. *Bustamante* (Utah 1982) 645 P.2d 40, 42; *Pirouzkar and Pirouzkar, supra,* 626 P.2d 380, 383-384; *Rzeszotarski* v. *Rzeszotarski* (D.C.App. 1972) 296 A.2d 431, 434-436; see also spec. conc. opn. of Pierce, J., in *Seren* v. *Douglas, supra,* 489 P.2d 601, 604). However, while not posing an absolute bar to establishing residence under the Act, an alien's nonpermanent immigration status certainly remains a factor bearing on domiciliary intent (*Nicolas* v. *Nicolas, supra,* 444 So.2d 1118, 1120), which can be determined in part from one's acts. (*Fenton* v. *Board of Directors, supra,* 156 Cal.App.3d 1107, 1117.)

---

(or federal) policy. Further, while the United States Supreme Court has expressly left open the question of whether the states *must as a matter of federal law* incorporate nonimmigrant visa status disabilities into state residency requirements (*Elkins* v. *Moreno, supra,* 435 U.S. 647, 663-664 [55 L.Ed.2d 614, 627]), other courts have since rejected the argument (see, e.g., *Pirouzkar and Pirouzkar* (1981) 51 Ore.App. 519 [626 P.2d 380, 382-383], and cases cited; but see *Seren* v. *Douglas, supra,* 489 P.2d 601, 603-604).

[14]Former section 11104 of the Welfare and Institutions Code, which at the writing of *Cabral* allowed an "otherwise qualified alien" to receive categorical aid and medical assistance upon the alien's certification that he or she was " 'not under order for deportation' " (*Cabral* v. *State Bd. of Control, supra,* 112 Cal.App.3d 1012, 1015, fn. 3), has since been repealed and replaced (Stats. 1981-1982, First Ex. Sess. 1982, ch. 3, § 8, p. 6893) with the following unequivocal, new section 11104:

"Aliens shall be eligible for aid only to the extent permitted by federal law.

"An alien shall only be eligible for aid if the alien has been lawfully admitted for permanent residence, or is otherwise permanently residing in the United States under color of law. No aid shall be paid unless evidence as to eligible alien status is presented."

[15]The Board has not argued that *Cabral* was wrongly decided.

The Board's act of denying appellant's application based solely on his nonimmigrant visa status was accordingly void as inconsistent with the Act and hence beyond the Board's power. (See § 11342.2; *Ontario Community Foundation, Inc.* v. *State Bd. of Equalization, supra,* 35 Cal.3d 811, 816-817; *Cabral* v. *State Bd. of Control, supra,* 112 Cal.App.3d 1012, 1017.)

## II

In light of our holding above, it is not necessary to reach appellant's equal protection arguments. (Cf. *Anselmo* v. *Glendale Unified School Dist., supra,* 124 Cal.App.3d 520, 523, with *Plyler* v. *Doe, supra,* 457 U.S. 202.) The Act, as construed herein, does not establish the complained of discrimination.

## DISPOSITION

Because appellant's visa status did not render him ineligible for assistance under the Act as a matter of law and because respondent Board has conceded that his eligibility was established in all other respects, it apparently only remains for the Board to determine the amount and form of assistance. Accordingly, the judgment is reversed, and the superior court is directed to issue a peremptory writ commanding the Board to vacate its decision and take such further action as may be required on the application.

Kline, P. J., and Rouse, J., concurred.