[Nos. B050928, B055942. Second Dist., Div. Four. Apr. 26, 1993.]

In re the Marriage of ELISABETH L. and JOHN W. DICK.
ELISABETH L. DICK, Appellant, v.
JOHN W. DICK, Appellant.

**COUNSEL**

Trope & Trope and Thomas Paine Dunlap for Appellant Wife.

Stephen A. Kolodny and Carole R. Azran for Appellant Husband.

**OPINION**

**WOODS (A. M.), P. J.**—These consolidated appeals arise from dissolution proceedings in the marriage of John W. and Elisabeth L. Dick. Both have appealed, wife from the judgment of dissolution, and husband from an order awarding spousal support and attorney fees. We considered each appeal separately.

## WIFE'S APPEAL

Wife appeals from the judgment of dissolution, arguing that the court lacked jurisdiction to render the judgment because husband's status as a nonimmigrant alien, i.e., a tourist, precluded a finding, for purposes of jurisdiction, that he intended to make his domicile in California. Viewed in the light most favorable to the judgment (*Sevier v. Locher* (1990) 222 Cal.App.3d 1082, 1087 [272 Cal.Rptr. 287]), the evidence established the following facts:

The parties married on February 14, 1982, and separated in April 1987. Wife filed an action for dissolution in Arapahoe County, Colorado, and then refiled the action in Denver, Colorado. Husband was not served with the Colorado actions.

On October 26, 1988, wife filed a petition for legal separation in the Los Angeles Superior Court. In the petition she stated her intention "to amend this Petition and request Dissolution of Marriage as soon as residence requirements are met." She subsequently filed a second petition that omitted this statement. The petition was served on husband by publication. In his response to the petition, husband stated that if he was able to meet California's "jurisdictional requirements, this Response to Amended Petition will be amended to seek dissolution of marriage." On December 29, 1989, husband amended his response to allege that he had satisfied the jurisdictional requirements of residence by residing in the state for six months and the county for three. He requested that the court dissolve the marriage. He also moved for bifurcation of trial so that the issue of status could be determined apart from the issue of spousal support.

Wife filed papers challenging husband's claim that he had satisfied the residence requirement. The core of her argument was that, because husband was a nonimmigrant alien, he could not possess the intention to be a resident of California. She cited deposition testimony by husband in which he admitted he was a Canadian citizen who had tourist status in the United States. She argued that under immigration law, tourist status embodied an intent to return to one's homeland, and this conflicted with an intent to become a resident of California for purposes of the dissolution proceedings.

The motion for bifurcation was granted and a trial conducted on the issue of status. The only issue as to which evidence was taken went to the question of whether husband had satisfied the residence requirement.

It was established at trial that during the marriage, the parties resided in Englewood, Colorado, but they also maintained residences elsewhere, including a manor on the Isle of Jersey in the Channel Islands, two houses in

Palm Springs, a house in Pasadena, a penthouse in London and a skiing condominium in Breckenridge, Colorado.

Husband testified that until 1984, he had dual American and Canadian citizenships. That year he renounced his American citizenship and became a citizen of the Dominican Republic. He continued to travel on a Canadian passport.

From 1981 to 1988 or 1989, husband testified he considered his principal residence to be on the Isle of Jersey. In June 1989, husband rented a room at his sister's house in Pasadena but subsequently rented an apartment in Los Angeles. Husband came to Los Angeles with the intent of remaining here indefinitely to develop business contacts. Husband obtained a California driver's license and opened a local bank account. While he lived at his sister's house, he paid her $400 a month for the room he occupied and had a telephone installed in it. He received his phone bill at her address and, after he moved out, his mail was forwarded to his Los Angeles apartment from his other residences. He also testified that he owned a car registered in California at his present address.

Husband testified that his current immigration status was as a tourist and that he was required to leave the country every six months and to reenter. He testified that he had discussed with his lawyer the possibility of obtaining a green card but had not yet filed an application for one.

At the conclusion of the trial, the court found that "residence does exist." It then went on to find irreconcilable differences and granted the judgment of dissolution. Wife appealed. We affirm.

## I

Wife presents five contentions: (1) that husband's immigrant status as a nonimmigrant alien precludes a finding of residence for purposes of dissolution; (2) that even if his immigrant status does not preclude a finding of residence, there is insufficient evidence to support that finding; (3) the court erred when it excluded wife's immigration expert from testifying; (4) the issue of status was not before the court because husband failed to obtain leave of court to file an amended response to her petition; and (5) the court erred by depriving wife of an opportunity to request a statement of decision. We deal with each contention seriatim.

"A judgment decreeing the dissolution of a marriage may not be entered unless one of the parties to the marriage has been a resident of this state for

six months and of the county in which the proceeding is filed for three months next preceding the filing of the petition." (Civ. Code, § 4530, subd. (a).) ■ Whether the residency requirement has been met is a question of fact and the burden of establishing residence is on the party asserting it. (*In re Marriage of Thornton* (1982) 135 Cal.App.3d 500, 510 [185 Cal.Rptr. 388]; *Khan* v. *Superior Court* (1988) 204 Cal.App.3d 1168, 1180 [251 Cal.Rptr. 815].) For purposes of Civil Code section 4530, subdivision (a), residency is synonymous with domicile, the latter term meaning " 'both the *act* of residence and an *intention* to remain . . . .' " (Original italics.) (*In re Marriage of Thornton, supra*, at p. 507, quoting *Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497].)

The parties have not cited to us, nor has our research disclosed, a California case that addresses the question of whether a nonimmigrant alien can establish residency for the purpose of obtaining a dissolution of marriage. However, the cases cited to us, and those which we have found, from other jurisdictions hold that immigration status is, at most, evidence of domiciliary intent, but not dispositive of the residency issue as a matter of law. These cases hold that a party's nonimmigrant alien status does not bar that party from establishing domicile for purposes of a dissolution statute. (*Rzeszotarski* v. *Rzeszotarski* (D.C.App. 1972) 296 A.2d 431]; *Alves* v. *Alves* (D.C.App. 1970) 262 A.2d 111 [51 A.L.R.3d 213]; *Nicolas* v. *Nicolas* (Fla.Dist.Ct.App. 1984) 444 So.2d 1118; *Abou-Issa* v. *Abou-Issa* (1972) 229 Ga. 77 [189 S.E.2d 443]; *Cocron* v. *Cocron* (1975) 84 Misc.2d 335 [375 N.Y.S.2d 797]; *Pirouzkar and Pirouzkar* (1981) 51 Ore.App. 519 [626 P.2d 380]; *Bustamante* v. *Bustamante* (Utah 1982) 645 P.2d 40; *Williams* v. *Williams* (D.V.I. 1971) 328 F.Supp. 1380.) We agree with the reasoning of these cases on this issue.

Wife acknowledges this authority, but insists that these cases are factually distinguishable because in each of these cases the nonimmigrant resident had applied for permanent resident status. This is not true of every case cited, however, and even where it is true, the intention of the noncitizen spouse to obtain a more permanent immigration status was not dispositive. In *Alves* v. *Alves, supra*, 262 A.2d 111, for instance, there was no suggestion that the nonimmigrant alien husband had demonstrated any intention to seek permanent resident status. Yet, the court held that, regardless of his immigration status, he had established domicile for purposes of obtaining a divorce in the District of Columbia.

In its thoughtful analysis, the *Alves* court said: "The relationship between an alien and a jurisdiction such as the District of Columbia, and an alien and the United States are not of equal significance. Domicile is concerned with

one's physical presence in a particular locality and the 'nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance.' It is the appellee's connection with the District of Columbia and the legal rights and duties which accompany his presence here that is of importance. Appellee's retention of British citizenship does not preclude his becoming domiciled in the District of Columbia. Nor do we think that the fact appellee did not apply for permanent residence in the United States forecloses the possibility of his being domiciled in the District of Columbia. Under the Immigration and Nationality Laws it is possible, for a variety of reasons, for an alien to remain in the United States for many years, as appellee has done, without applying for permanent residence. Furthermore, to impose such a requirement [of seeking permanent resident status] would have the effect of denying appellee access to our courts without regard to the period of time he has resided in the District of Columbia, his intention in moving into the District of Columbia and other relevant factors. Just as aliens are subject to the jurisdiction of our courts, they should be entitled to invoke the jurisdiction of the courts for their own benefit." (*Id.* at pp. 114-115, fns. omitted.) With respect to the question of husband's visa status, the court remarked, "A visa is a document of entry required of aliens by the United States Government and is a matter under control of the Government. It has little relevance to the question of domicile." (*Id.* at p. 115.)

Similarly, in *Bustamante* v. *Bustamante, supra,* 645 P.2d 40, the Utah Supreme Court "emphasize[d] that a visa application or renewal form indicating a date certain for return to one's home country is not necessarily inconsistent with an actual conditional intent to establish permanent residency in the United States, if possible, by means of renewals and extensions of one's nonimmigrant status or attainment of immigrant status." (645 P.2d at p. 42.) The court held "an alien may have a 'dual intent'—an intent to remain if that may be accomplished and at the same time an intent to leave if the law so commands." (*Ibid.*; *Cocron* v. *Cocron, supra,* 375 N.Y.S.2d at p. 809 ["[wife's] arrival under a temporary visa is not enough to prevent [her], from becoming a resident of this state for purposes of maintaining an action for divorce [citation]. . . ."].)

We conclude that husband's nonimmigrant status does not preclude a finding of residence under California law for purposes of obtaining a dissolution of marriage. We agree with *Bustamante* and *Cocron* that a nonimmigrant alien in the United States on a renewable visa may have the dual intention of remaining in this country indefinitely by whatever means including renewal of a visa and of returning to his or her home country if so compelled. At most, "alien status can . . . operate as an evidentiary fact

against the person's alleged intention to remain in the state permanently [citation]." (*Cocron* v. *Cocron, supra,* 375 N.Y.S.2d at p. 809.)

This conclusion is buttressed by the different aims and purposes of immigration and dissolution law; "[t]here is no rational ground for intermingling these two distinct areas of law . . . ." (*Williams* v. *Williams, supra,* 328 F.Supp. at p. 1383.) It is not necessary for the courts of this state to carry out immigration policy by denying nonimmigrant aliens a judicial forum when they otherwise meet domiciliary requirements and when they are subject to the courts of this state for other purposes. (*Ibid.* ["The enforcement of immigration laws properly remains with those to whom it is entrusted by law and does not need in aid of enforcement the judicially created civil disability of exclusion from our divorce courts."]; *Pirouzkar and Pirouzkar, supra,* 626 P.2d at p. 384 ["The enforcement of the immigration laws is the function of the federal government."].)

Wife cites numerous cases, none of them, however, involving the question before us. Chiefly, she relies on a Supreme Court case called *Elkins* v. *Moreno* (1978) 435 U.S. 647 [55 L.Ed.2d 614, 98 S.Ct. 1338], which involved a claim by a nonimmigrant alien residing in Maryland to the benefits of "in-state" status at the University of Maryland. As was pointed out in *Pirouzkar and Pirouzkar, supra,* 626 P.2d 380, however, while *Elkins* "held that federal law did not prevent the establishment of a domicile in this country by nonimmigrant aliens present pursuant to visas which do not require the maintenance of a foreign residence [it] specifically did not decide the issue as to those nonimmigrant aliens whose visas require that a foreign residence be maintained." (*Id.* at p. 383, fn. 2.) Thus, because it specifically declined to consider the issue, *Elkins* lends no support to wife's claim that husband is precluded from establishing domicile because of his tourist status. Likewise, *Seren* v. *Douglas* (1971) 30 Colo.App. 110 [489 P.2d 601], involves the classification of a nonresident alien for purposes of determining whether or not to extend "in-state" university benefits and is not relevant to the issue before us.

Wife's reliance on *Anselmo* v. *Glendale Unified School Dist.* (1981) 124 Cal.App.3d 520 [177 Cal.Rptr. 427], deals most directly with the issue before us. *Anselmo* held that the child of nonimmigrant aliens was ineligible to attend public school, despite the fact that her parents had purchased a home in the district, because the statute under which their visa was issued defined an alien as "having residence in a foreign country." In *Illingworth* v. *State Bd. of Control* (1984) 161 Cal.App.3d 274 [207 Cal.Rptr. 471], a decision that held a nonimmigrant alien was eligible for monetary assistance under the violent crime act, the court distinguished *Anselmo*: "The holding in

*Anselmo* clearly depended on the statute's reference to federal law and thus must be distinguished from this case, where the statute is silent as to the definition of residence." (*Illingworth* v. *State Bd. of Control, supra,* at p. 281.) It is not as clear to us that *Anselmo's* reference to the United States Code definition of status is sufficient reliance on federal law to distinguish it from further consideration. With all due respect, in our opinion *Anselmo* was wrongly decided. For reasons we have stated, we agree with those courts which have held that the federal requirement of maintaining a residence in a foreign country is not necessarily inconsistent with establishing domicile under state law.

Accordingly, we hold that a nonimmigrant alien is not precluded from establishing residence in California for purposes of the dissolution statute.

## II

◼ Wife next contends that, even if husband's immigration status did not preclude him from establishing residence, the court abused its discretion in determining that he had satisfied the residency requirement. This is, of course, an attack on the sufficiency of the evidence. ◼ Under the substantial evidence rule of appellate review, "the reviewing court's task begins and ends with a determination as to whether there is any substantial evidence in the record to support" the trial court's finding of domicile. (*In re Marriage of Leff* (1972) 25 Cal.App.3d 630, 641 [102 Cal.Rptr. 195].) Moreover, where there was conflicting evidence below "that which favors the judgment must be accepted as true, and that which is unfavorable must be discarded as not having had sufficient verity for acceptance by the trial court. [Citations.]" (*Ross* v. *Lawrence* (1963) 219 Cal.App.2d 229, 232-233 [33 Cal.Rptr. 135].)

◼ As noted above, residence is established under Civil Code section 4530 if either party has resided in the state for six months prior to the petition for dissolution and three months in the county where the petition is filed. More generally, residence requires proof of physical residence and an intention to remain. (*In re Marriage of Thornton, supra,* 135 Cal.App.3d at p. 507.)

◼ Applying the appellate standard of review, the record shows: that husband has been a continuous resident of Los Angeles County since June 1989; that he intends to remain indefinitely in Los Angeles County; that he regards no other place in the world as his residence; that he had moved from a room in his sister's house to an apartment of his own in furtherance of his intent to remain in Los Angeles County; that he quit residence on the Isle of

Jersey in 1989 and has not continuously resided in Colorado since 1987; that the only reason he failed to file state or federal tax returns was because he had no taxable income in California or the United States; that he has a California driver's license and owns an automobile registered at his current Los Angeles address; that his sole bank account was located in Los Angeles; that he receives all of his mail in Los Angeles either directly or by forwarding.

Wife contends that the trial court's finding on residency is not supported by the evidence and cites contrary evidence. It is obvious that the trial court disregarded the evidence upon which wife relies, and so must we. The trial court's factual determination is binding on this court "even though evidence conflicts or supports contrary inferences. [Citations.]" (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1185 [212 Cal.Rptr. 803].) Under this standard of review, we have searched the record and concluded that substantial evidence supports the trial court's finding of residency.

### III

 Wife complains that the court erred when it denied her request to call an expert on immigration law. According to wife, the expert was required to testify to "the requirements and significance relating to entrance into the United States of a person in John's circumstances." Whether or not to permit expert testimony is largely within the discretion of the trial court. (*Downer* v. *Bramet* (1984) 152 Cal.App.3d 837, 842 [199 Cal.Rptr. 830].) Although strict application has been criticized, the general rule is that expert testimony on domestic law is usually inadmissible. (See 1 Witkin, Cal. Evidence (3d ed. 1986) § 535, p. 507.) In this case, the issue of husband's nonimmigrant status was not dispositive of the question of residence, and therefore the court could well determine that the proposed expert testimony was tangential, cumulative or otherwise unnecessary. We find no abuse of discretion in the exclusion of the proffered testimony. In any event, wife fails to show that the ruling so prejudiced her as to constitute a miscarriage of justice. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 324, pp. 334-335.)

 Wife also complains that husband's failure to obtain leave of the court to formally amend his response to seek dissolution of marriage renders the court's judgment void. The contention is without merit because the authority she relies on, Civil Code section 4530, fails to support her. Civil Code section 4530, subdivision (b) states that a party satisfying the residency requirement may "amend his petition or responsive pleading in such proceeding [for legal separation] to request that a judgment decreeing the

dissolution of the marriage be entered . . . . If an appearance has been made in the proceeding, *notice* of such amendment shall be given to the other party in the manner provided by rules adopted by the Judicial Council. . . ." (Civ. Code, § 4530, subd. (b), italics added.)

Regarding notice, the Family Law Rules provide that "When a notice or other paper is required to be given or served on a party, such notice or service shall be given to or made on his attorney of record if he has one." (Cal. Rules of Court, rule 1201(b).) As husband points out, he provided notice of his amendment to his response to wife's petition prior to the trial of the matter, thus satisfying Civil Code section 4530, subdivision (b). Wife's claim that that statute required husband to seek leave of court to amend his response simply misreads the statute; that section relates to notice, not the form, of the amendment.

Finally, wife originally contended that the court erred by entering judgment without permitting her to request a statement of decision. By letter dated September 30, 1991, wife withdrew this argument and we do not consider it further.

The judgment of dissolution is affirmed. Husband's request for sanctions is denied.

### HUSBAND'S APPEAL

Husband appeals from an order awarding temporary spousal support and payment of attorney fees. He contends (1) the court's award of spousal support was improper because it was retroactive to a date before wife filed her order to show cause for spousal support; (2) the order was based on husband's ability to borrow rather than his ability to pay; (3) there was insufficient evidence of his ability to borrow funds to pay the sums required of him; (4) the order requiring payment of attorney fees and other costs was also improperly based on husband's ability to borrow; and (5) the award of future attorney fees exceeded the amount claimed by wife and must be vacated. After review, we find no merit in these contentions and affirm.

We need not repeat the procedural facts which were previously stated in connection with wife's appeal. Suffice it to say that on October 26, 1988, wife filed a petition for legal separation in which she requested spousal support, attorney fees and costs. A first amended petition for legal separation, also seeking spousal support, fees and costs, was filed on November 10, 1988, and served on husband by publication. On July 27, 1989, husband filed his response to the petition. As we have indicated, the court bifurcated

the issue of status from issues relating to temporary spousal support. On February 9, 1990, husband filed an order to show cause on spousal support and attorney fees. Husband declared that he had "no positive net monthly disposable income." On March 8, 1990, wife filed her order to show cause on spousal support and attorney fees. In it, she requested monthly spousal support of $101,268 per month and submitted a declaration that detailed a lavish life-style enjoyed during the marriage. She also requested a total of $1,050,000 in attorney fees, accounting fees, appraisal fees and other costs.

Trial began on July 24, 1990, and ended nearly five months later, on December 10, 1990. The trial judge awarded wife $35,000 a month in spousal support retroactive to January 1, 1989, and present and prospective attorney and accounting fees in the total amount of $1,047,921.71 of which $900,000 was for future attorney and accounting fees. We will set forth the additional facts adduced during the trial as is necessary to our discussion.

I

The bulk of husband's argument is directed to two points: (1) that the court's order of temporary spousal support and attorney fees and costs was improper because it was based on his ability to borrow, rather than his ability to pay, and (2) there was no evidence that he had either income to pay or the ability to borrow the sums of money he was ordered to pay. We find no merit in husband's arguments. By its express terms, the trial court's order was based on husband's ability to pay and there was substantial evidence to support it.

Civil Code section 4357 permits a temporary award of spousal support "that is necessary for the support and maintenance of the [spouse] . . . ." (Civ. Code, § 4357, subd. (a).) Similarly, Civil Code section 4370 authorizes the payment of attorney fees and costs pendente lite. (Civ. Code, § 4370, subd. (a).) ▮ Awards under these two sections are based on "a showing of two conditions: the moving party's needs, and the other party's ability to pay . . . ." (11 Witkin, Summary of Cal. Law (9th ed. 1990) Husband and Wife, § 181, p. 215; *In re Marriage of Garcia* (1990) 224 Cal.App.3d 885, 893 [274 Cal.Rptr. 194].) Ability to pay encompasses far more than the income of the spouse from whom temporary support is sought; investments and other assets may be used for both temporary spousal support and attorney fees pendente lite. (*Rosenthal* v. *Rosenthal* (1961) 197 Cal.App.2d 289, 299 [17 Cal.Rptr. 186]; *In re Marriage of Stich* (1985) 169 Cal.App.3d 64, 74 [214 Cal.Rptr. 919].)

▮ In the instant case, the trial court made the specific and unequiv-ocal finding that husband "has the ability to pay" based on the "extensive

assets and nonsalary income at his disposal" which "have been placed by him in the control of others acting for his benefit [and] have a value in excess of $20,000,000." It was proper for the court to look to assets controlled by husband, other than income, as a basis for the award. (*Rosenthal* v. *Rosenthal, supra,* 197 Cal.App.2d at p. 299; *In re Marriage of Stich, supra,* 169 Cal.App.3d at p. 74.) The evidence supports the trial court's finding of husband's ability to pay.

Husband's claim that the temporary spousal support and attorney fees awards were based on his ability to borrow is a deceptive characterization of the trial court's order based on husband's testimony that he was without the means to pay the sums ordered, and had no hidden assets. It is clear that the trial court utterly disbelieved him, and its assessment of husband's credibility is binding on this court. (*Stokus* v. *Marsh* (1990) 217 Cal.App.3d 647, 656 [266 Cal.Rptr. 90].) The record offers substantial evidence in support of the trial court's order. (*In re Marriage of Grinius, supra,* 166 Cal.App.3d at p. 1185 [trial court's factual determinations binding and conclusive on appellate court if supported by substantial evidence].)

As the trial court noted in its order, the reporter's transcripts in this case alone exceed 2,500 pages. While we have reviewed the entire record, it is not necessary, for purposes of this opinion, to summarize all of the evidence; we need only determine that there is substantial evidence to support the trial court's order, to affirm it. (*Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 337 [126 Cal.Rptr. 731].) Accordingly, we will follow the trial court's example and recount only that evidence which was cited by the court in support of its specific factual findings.

Husband contends, without citation to the record, that wife failed to prove her need for temporary spousal support. As a corollary, he argues that, because she had been advanced over $2 million in loans by her friend, Bill Daniels, she has no need for spousal support. The court found, however, that wife was unable to support herself, had no assets or income at her disposal and that the moneys extended to her by Daniels were, in fact, loans which were to be repayed and not gifts. Substantial evidence supports these findings.

The evidence shows that wife was sixty-three years old, that she had not worked in eight and a half years, that she lacked vocational skills, and that her formal education had ended with a year and a half of college. The evidence also showed that the only support she had received from husband was payments of $3,000 a month, which had been stopped more than a year before the trial, forcing wife to borrow money from Daniels. Both wife and

Bill Daniels testified that he had loaned her over $2 million which she used to support herself and for litigation costs. Daniels testified that his motive in making the loans was because he "[had] a problem . . . where husbands . . . leave wives who have no money, can't afford an attorney, can't pay the bills and say to the wife 'So sue me.' " Notwithstanding husband's innuendo, both Daniels and wife denied having a romantic or sexual relationship. Daniels also testified that he had decided not to make further loans to wife, depriving her of her only source of funds. The evidence thus established wife's need for temporary spousal support and an award for past and prospective attorney fees and other litigation costs.

There was, as discussed, ample evidence to support the trial court's finding of husband's ability to pay based on assets and nonsalary income, not in husband's name but under his control. The court found: "The assets belonging to [husband], which have been placed by him in the control of others acting for his benefit, have a value in excess of $20,000,000." The crucial finding was that husband had organized his assets so that he had created "a labyrinth of trusts and corporations designed by him . . . to shield and protect [him] from creditors. . . . [A]lthough the evidence fails to disclose any assets actually standing in the name of [husband], he has access to and control of extensive assets . . . ." The court concluded "that the transactions by which [husband] transferred ownership of assets from his name to various off-shore trusts and corporation[s] were for the purpose of tax avoidance and to create a shelter from creditors, and that for the purpose of this proceeding, they must be disregarded." Ample legal authority supports this conclusion.

■ It is well-settled that a trust created for the purpose of defrauding creditors or other persons is illegal and may be disregarded. (*Samuelson* v. *Ingraham* (1969) 272 Cal.App.2d 804, 806 [77 Cal.Rptr. 750]; Prob. Code, § 15203 ["A trust may be created for any purpose that is not illegal or against public policy."].) This rule has been applied to the creation of trust where the grantor's intention "was to prevent his wife, . . . , from reaching the property." (Fn. omitted.) (IA Scott on Trusts (4th ed. 1987) § 63, pp. 363-364; *Farino* v. *Farino* (1982) 88 A.D.2d 902 [450 N.Y.S.2d 593].) ■ The rule regarding fraudulent corporations is equally well settled: "When a corporation is used by an individual or individuals, or by another corporation, to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the acts as if they were done by the individuals themselves . . . ." (9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, p. 524, italics deleted; *Kohn* v. *Kohn* (1950) 95 Cal.App.2d 708, 717-720 [214 P.2d 71] [corporate entity disregarded to the extent

its purpose was to minimize husband's assets for alimony payments].) Thus, the court below was entitled to look past the apparent form of ownership in which husband's assets were held to determine the extent of husband's true interest in them and the availability of those assets in assessing husband's ability to pay. (*Rosenthal* v. *Rosenthal, supra,* 197 Cal.App.2d at p. 299.)

The court's factual findings, including its implied conclusion that husband's testimony was not believable, are also supported. For example, husband testified that his only source of income was a $5 million "credit line" from a trust company called La Hogue Boete. Husband, however, failed to supply any evidence documenting this financial transaction. He testified that the line of credit was guaranteed by a childhood friend named George Neufeld. However, as far as husband knew, Neufeld, the alleged guarantor of the loans, had never provided a personal financial statement to La Hogue Boete. Moreover, in an earlier declaration, husband had disavowed any business dealings with Neufeld: "Mr. Neufeld would have no knowledge of my income, assets or personal affairs." In contrast to husband's claim of penury, the court noted that husband's 1984 and 1985 personal financial statements, which were admitted into evidence, indicate net worths of $42,008,193 and $46,459,473, respectively. The court concluded that husband had "failed to credibly explain where the assets he held in 1985 and 1986 went, particularly in view of [his] ability to continue to use assets not standing in his name."

As an example of husband's ability to use assets not standing in his name, the court pointed to husband's use of an English manor house called St. John's Manor on the Isle of Jersey. Until 1989, husband considered St. John's Manor his principal residence. Title to the property was held in trust by an entity called the Manorhouse Trust. Husband denied being a trustee, trustor or beneficiary of that trust. Yet, as the court pointed out, in a 1988 declaration to the Royal Court of the Isle of Jersey, husband declared that he was the " 'Signeur [*sic*] of St. John' " and intended to be buried in the crypt beneath the chapel. Additionally, husband's initials "JWD" were carved into a stone entryway. Moreover, a letter to the prior owner from husband's lawyers stated that the manor would be purchased, not by husband in his own name, but "by a company incorporated in Jersey and wholely [*sic*] owned by Mr. Dick known as 'St. John's Manor Limited'." (St. John's Manor Limited continued to hold title to farmland around the manor, while the house was held by the Manorhouse Trust.)

The method by which title to the manor was held illustrates the court's finding that husband used "a labyrinth of trusts and corporations" to avoid

legal title to assets he otherwise controlled. Manorhouse Trust, the record owner, was administered by a trust company called La Hogue Boete. La Hogue Boete was not only operated by former employees of a trust company that had previously administered husband's trusts, but its offices were located at St. John's Manor. The only other clients of La Hogue Boete that husband knew of, were his brother-in-law and a longtime business associate. Husband admitted, moreover, that he instructed La Hogue Boete on investments and that it had never made an investment of which he disapproved.

Husband was, moreover, the only person who resided at St. John's Manor. He paid no rent except by way of living expenses. These were paid to the Manorhouse Trust through a client account at La Hogue Boete. Although La Hogue Boete prepared statements for husband, they were not mailed to him and he saw them only when he happened to be at the manor. His children, the alleged beneficiaries of the Manorhouse Trust, had never received any disbursements from the trust nor was there evidence that they or anyone else resided at the manor without husband's consent.

It could be inferred from this evidence that, notwithstanding his absence of legal title, husband controlled ownership of St. John's Manor through the fiction of a trust.

Another example, cited by the trial court, of husband's use of an asset not in his name was his use of a large house outside Denver, Colorado, described by wife as "one of the largest residences in the Denver metropolitan area." The court found that the way in which title to the house was held during the marriage illustrated the "complicated scheme of 'hide the assets'. . ." engaged in by husband. Title to the Denver residence was held by an entity called Alkobel. Husband denied ownership or other interest in either the house or Alkobel. Despite the denial, however, husband's federal tax return for 1981 reported the sale of the residence. He never replaced this residence with another, nor did he ever declare a taxable gain on the sale. From this the trial court inferred that the Denver residence continued to be within husband's control notwithstanding the claimed change of ownership. Moreover, in a 1982 letter to the United Bank of Denver for purposes of obtaining a loan, husband wrote, with respect to this same piece of property, "I am the sole owner of my residence at Seven Sunset Drive, Englewood, Colorado 80110." Additionally, when the house was remodeled, it was done under husband's supervision. He decided what changes would be made to the residence. He also chose the furniture for the residence and directed the servants who worked there.

In addition to husband's apparently unlimited and unrestrained use of assets as to which he denied ownership, the trial court also observed that

"the evidence discloses that in 1984 through 1986, [husband] parted with millions of dollars under suspicious circumstances . . . ." The court specifically cited a transaction at the end of 1984 in which husband allegedly "sold" millions of dollars of assets.

That year, husband apparently rid himself of all his United States assets by "selling" them to his former secretary, Corrine Brown, and two business associates, Bill Pauls and Ray Near. No cash changed hands. Instead, husband accepted promissory notes totalling $17.5 million that were not due until 1996. Husband put these notes up as collateral for a short term $5 million loan from an entity called "Sansend." The $5 million loan, in turn, became past due, yet Sansend made no effort to collect on it. The court found that this was a sham transaction, the apparent purpose of which was to remove husband from title of assets while still allowing him to exercise control of them through complicit business associates.

The trial court found "[husband] has an obsession with the concept of having no indicia of ownership of property standing in his name, yet controlling and using said property as if it were his own." As the court noted, assets as disparate as a doll collection, automobiles, condominiums used by husband's parents and two Palm Springs houses, one of which husband used as his residence, were all held in a network of related trusts.

Regarding the value of husband's hidden assets, wife's expert accountant testified that they were worth $160 million. This evaluation took into account the value of various trusts and real property, plus $91 million which was being held by a company called Barclay Trust for an undisclosed beneficiary who wife's expert identified as husband. Husband offered no evidence contesting the assessed value of those assets; he merely denied having any control over them. The trial court's conclusion that his assets are worth at least $20 million is thus supported by substantial evidence.

The evidence we have set forth by way of illustration supports the trial court's finding that husband has the ability to pay spousal support and attorney fees and the finding that husband has obsessively sought to rid himself of any indicia of ownership of his considerable assets, while using or drawing upon them. The evidence shows, moreover, that when it has been convenient to him, husband has asserted his ownership of various assets, the ownership of which he now denies.

The evidence also shows that husband's transfers of assets, by "sale" or placing them into trust, involve people to whom he is related or who are or have been his employees or business associates, and who could, therefore, be

expected to act at his behest. It can be inferred from this evidence that husband is capable of complying with the order for payment of support and attorney fees. Accordingly, the order must be affirmed.

 Before leaving our review of the court's findings and the evidence that supports them, we address husband's additional claim that the spousal support award is excessive. The amount of temporary spousal support awarded by a court is a matter of discretion and will not be reversed absent a clear showing of abuse of discretion. (*In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1316 [284 Cal.Rptr. 41].) Husband does not even attempt to make such a showing, but simply refers to his testimony, which the trial court has rejected as unworthy of belief.

The evidence supports the trial court's award of $35,000 a month in temporary alimony. The trial court has valued husband's assets as being in excess of $20 million. The expert evidence offered by wife would indicate this estimate is conservative. Wife's testimony established that the parties enjoyed a lavish life-style that included residences here and abroad, servants, continuous first-class travel, the use of expensive automobiles and unlimited funds for clothing and entertainment, among other luxuries. One of wife's expert accountant witnesses testified from a reconstruction of expenses that wife and husband had spent $74,521 monthly during the last 17 months of their marriage. We conclude that this evidence supports the amount of spousal support ordered by the trial court.

II

 Husband next contends that the court erred by making its spousal support order retroactive to January 1, 1989. The argument is without merit.

The trial court determined that jurisdiction to award temporary spousal support existed from October 26, 1988, the date on which wife filed her petition for legal separation. In that petition she requested spousal support although she did not file her formal order to show cause until March 8, 1990. Husband contends that she was not entitled to temporary spousal support until the filing of the order to show cause. Husband also claims that the order was a mistake, but there was no mistake; the court intended precisely what the written order set forth, spousal support was to be retroactive to January 1, 1989, approximately two months after wife requested support in her petition for legal separation.

In support of his argument husband cites us to Civil Code section 4801, subdivision (a), which governs *permanent* spousal support, rather than temporary spousal support. Section 4801, subdivision (a)(10) provides in part:

"Any order for spousal support may be made retroactive to the date of filing of the notice of motion or order to show cause therefor, or to any subsequent date." (Civ. Code, § 4801, subd. (a)(10).) Husband maintains that this language also encompasses temporary support orders made under Civil Code section 4357, even though that section is neither mentioned in section 4801, nor does similar language appear in section 4357.

 Awards of temporary spousal support do not serve the same purpose, nor are they governed by the same procedures, as awards for permanent spousal support. "Pendente lite allowances and permanent allowances differ fundamentally in nature [citation] and function [citation]. 'The manifest purposes of pendente lite allowances to a wife are to enable her to live in her accustomed manner pending the disposition of the action and to provide her with whatever is needed by her to litigate properly her side of the controversy. [Citations.] . . .' . . . [¶] 'On the other hand the object of permanent allowance is to make an equitable apportionment between the parties. . . .' " (Italics deleted.) (*Estate of Fawcett* (1965) 232 Cal.App.2d 770, 783-784 [43 Cal.Rptr. 160]; *In re Marriage of Czapar, supra,* 232 Cal.App.3d at p. 1316 [no factual findings required for temporary as opposed to permanent support award].) Moreover, it is an accepted rule of statutory construction that "[w]hen the Legislature 'has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded.' [Citations.]" (*Pasadena Police Officers Assn.* v. *City of Pasadena* (1990) 51 Cal.3d 564, 576 [273 Cal.Rptr. 584, 797 P.2d 608].) If the Legislature had wanted to limit the retroactivity of temporary spousal awards to the date on which the order to show cause was filed, as it had in Civil Code section 4801, it could have expressly so provided, but since it did not, we will not imply such a limitation.

Plainly inferable from husband's argument is a concession that the court could have made the temporary support award retroactive; his quarrel is with the date to which it was actually made retroactive. The trial court, in effect, found that jurisdiction to make the award commenced upon wife's filing of her petition for legal separation on October 26, 1988, but that "through no fault of [wife], a conclusion to these temporary support hearings has been delayed until this date." Except for his citation to Civil Code section 4801, husband fails to provide any authority for his contention that retroactivity is limited to the filing of the order to show cause. We therefore reject his argument.

### III

 Husband attacks the trial court's award of $750,000 in future attorney fees to wife, contending the award must be reversed because wife

had only requested $500,000 in such fees. The court's award, he claims, was without "advance notice or due process" to him. The argument is without merit.

The purpose of an award of future attorney fees in a dissolution proceeding is to provide the party to whom the award is made an adequate amount to properly litigate the action. (*In re Marriage of Ward* (1992) 3 Cal.App.4th 618, 627 [4 Cal.Rptr.2d 365].) "[T]he [trial] court has broad discretion in awarding attorney fees and costs in dissolution proceedings. Its determination will not be disturbed on appeal absent a clear showing of an abuse of discretion. [Citations.]" (*Id.* at p. 628.)

Civil Code section 4370.5 permits such award as "is just and reasonable under the relative circumstances of the respective parties." (Civ. Code, § 4370.5, subd. (a).) Among other factors, the court may consider " 'the nature of the litigation, its complexity, the nature and extent of the contest, the amount involved, the financial circumstances of the parties, the skill required, the professional standing and reputation of the husband's attorneys and the attorneys selected by the wife.' [Citation.]" (*In re Marriage of Norton* (1988) 206 Cal.App.3d 53, 57 [253 Cal.Rptr. 354], quoting *In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213, 1219 [215 Cal.Rptr. 789].) Additionally, the trial court may employ its own experience in fixing the amount of the award. (*In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 280 [268 Cal.Rptr. 83].)

In *Ananeh-Firempong*, the trial court awarded wife $20,000 in attorney fees, even though the only evidence of the amount was wife's testimony that she had been advised her legal fees were just over $15,000. Husband appealed. The appellate court affirmed the award as within the discretion of the trial court. In doing so, the court emphasized the role of the trial judge in determining an appropriate amount of fees, " 'The knowledge and experience of the trial judge afford a sufficient basis for fixing the amount of a lawyer's fee, even though there was no specific evidence on the subject.' " (219 Cal.App.3d at p. 280, quoting *Frank* v. *Frank* (1963) 213 Cal.App.2d 135, 137 [28 Cal.Rptr. 687].)

As wife notes, in the instant case, the judge who sat by stipulation was formerly a supervising judge of the Family Law Department of the Los Angeles Superior Court and, therefore, particularly qualified to make a rational assessment of wife's future litigation needs. Moreover, as wife also points out, though the attorney fee award was $250,000 more than she had requested, the total award for attorney fees, accounting fees and costs was less than the total amount she had requested for these fees and costs. Her requests were supported by lengthy declarations and copies of billings.

Viewing the evidence in the light most favorable to the award (*In re Marriage of Huxley* (1984) 159 Cal.App.3d 1253, 1263 [206 Cal.Rptr. 291]), substantial evidence supports the award for future fees. The court found that wife was without any funds to support the litigation. The inordinately lengthy record here presented, reveals a case of stunning complexity, occasioned, for the most part, by husband's intransigence. For example, a declaration of wife's Colorado attorney revealed that after wife filed her original action in Colorado, husband managed to evade service for 26 months. In addition to the dissolution proceedings, wife was also required to defend against efforts to evict her from the family residence in Denver, brought by the trust that allegedly owned the home. The declaration also stated that husband had originally filed a divorce action on the Isle of Jersey, but then, fearing he would be served in the Colorado action, withdrew the case, but only after wife's attorney had gone to the island to defend that action. Wife was eventually compelled to seek jurisdiction in the California courts. Once in California, other tactics caused wife's attorney fees to escalate, such as the occasion on which husband's attorney scheduled wife's attorney's deposition in California, and then failed to attend.

Quite apart from declarations and billing statements, the record of this trial, which exceeds 5,000 pages in reporter's transcripts and appendices, is also a monument to the complexity of this case.[1] Both the record and the enormity of the fees which wife has already paid, support the trial court's award of future fees.

The judgment of dissolution and the orders of temporary spousal support and attorney fees are affirmed. Each side to have his or her own costs on appeal.

Epstein, J., and Hoffman, J.,* concurred.

The petition of appellant John W. Dick for review by the Supreme Court was denied August 26, 1993.

---

[1] For example, wife called Preston Hofer, a litigation accountant, whose testimony was directed at husband's multifarious trusts and corporations. His testimony alone takes up several hundred pages of transcript in an effort to unravel husband's business affairs.

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.