## Alison M. Clark v. Thomas B. Clark

[779 A.2d 42]

No. 99-028

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Toor, Supr. J., Specially Assigned

Opinion Filed June 22, 2001

Motion for Reargument Denied August 2, 2001

*Kathleen B. Hobart* of *Fitzpatrick & Hobart,* Jeffersonville, for Plaintiff-Appellee.

*Mary P. Kehoe* of *Saxer Anderson Wolinsky & Sunshine, P.C.,* Burlington, for Defendant-Appellant.

**Skoglund, J.** Father appeals from an order of the Chittenden Family Court granting mother's motion to modify child support. He argues that the court had no jurisdiction to modify the award because mother failed to meet her burden of showing a real, substantial and unanticipated change of circumstances, see 15 V.S.A. § 660(a) & (b); and, even if the court had jurisdiction, it incorrectly determined the amount of the modified award. We affirm.

The following facts are not in dispute. Mother and father were married in 1980. Their son Justin was born in 1982 and their daughter Mattie was born in 1986. Justin suffers from moderate cerebral palsy and, developmentally, is about five years behind his chronological age. He also suffers from attention deficit disorder and, as a result, has problems with his peers and with authority figures. Mattie is healthy and has no special needs.

During the marriage, the parties resided in Charlotte, and Justin attended Charlotte Elementary School, where he received special education services. The parties were divorced in 1993. Pursuant to the parties' stipulation, the court, in its final divorce order, awarded mother parental rights and responsibilities for Justin and Mattie, awarded father visitation, and provided that child support would be determined by the magistrate. Over father's objection, the court awarded mother sole possession of her interest in her father's estate and the Alison Clark Trust, a testamentary trust established by her father. The magistrate subsequently set child support at $944.92 per month, pursuant to the parties' stipulation.

Father appealed the portion of the family court's decision that awarded mother the estate and trust. In March 1994, the magistrate issued a child support order in the amount of $1,287.00 per month, in accordance with the child support guidelines. Father agreed to dismiss his appeal when mother agreed to stipulate to a child support order of $600.00 per month. In November 1994, the parties stipulated to child support of $600.00 per month, and in December 1994, the magistrate

amended the order accordingly. The amended order deviated from the child support guidelines by more than ten percent.

In the spring of 1994, mother moved to South Burlington because she found Charlotte too isolating, and because she had heard positive things about the South Burlington school system's program for special-needs children. Justin, however, had difficulty in the school system. In March 1995, mother visited Crotched Mountain Rehabilitation Center and Preparatory School in New Hampshire, determined it was appropriate for Justin, and enrolled him there in June 1995, at a cost of $88,349.00 per year. In September 1995, mother filed a motion to modify child support; in June 1998, the magistrate granted mother's motion and set child support at $1,707.00 per month. The family court affirmed. Father appeals.

## I. Real, Substantial and Unanticipated Change of Circumstances

Father first argues that the court had no jurisdiction to modify the award. According to father, because Justin's needs were apparent from an early age, the fact that he required special schooling was not a real, substantial, and unanticipated change of circumstances.[1]

15 V.S.A. § 660(a) provides, in pertinent part:

> On motion of either parent . . . and upon a showing of a real, substantial and unanticipated change of circumstances, the court may annul, vary or modify a child support order, whether or not the order is based upon a stipulation or agreement.

15 V.S.A. § 660(b) provides, in pertinent part:

> A child support order . . . [that] varies more than ten percent from the amounts required to be paid under the support guideline, shall be considered a real, substantial and unanticipated change of circumstances.

Under § 660(b), because the child support order mother sought to modify deviated from the guidelines by more than ten percent, the

---

[1] The magistrate found that Crotched Mountain was not an extraordinary educational expense for purposes of determining mother's income. See 15 V.S.A. § 653(4) & (9). He did, however, find that Justin's enrollment at Crotched Mountain was a real, substantial and unanticipated change of circumstances for purposes of establishing jurisdiction to modify the support order. The family court affirmed. Father does not argue that the magistrate erred in finding that Crotched Mountain was not an extraordinary educational expense. Therefore, we do not address the issue.

court had jurisdiction to modify the order. See *Grimes v. Grimes*, 159 Vt. 399, 406, 621 A.2d 211, 214 (1992) (declining to reach issue of whether decrease in father's income was real, substantial and unanticipated change in circumstances under § 660(a), citing § 660(b), and stating: "Because it is undisputed that the 1987 order set the child support obligation more than 10% above the guideline amount, the court did not err in modifying the order.").

## II. Amount of Award

Father argues that the court incorrectly determined the amount of the modified award because the court failed to impute income to mother for stocks that father contends are performing poorly, stocks that were not generating any income at the time of the hearing, expenses the trust incurs annually, and the increase in value of the trust corpus. Further, father argues, the court erroneously imputed $600 per month in income to him based upon the monthly rental value of a cottage that father's employer allows him to live in for free.

In Vermont, child support obligations are based upon the gross incomes of the parties. See *Ainsworth v. Ainsworth*, 154 Vt. 103, 107, 574 A.2d 772, 775 (1990). The language of 15 V.S.A. § 653(5) defines "gross income," in the context of child support calculations, as the "actual gross income of a parent," including "income from any source, including, but not limited to, . . . trust income." 15 V.S.A. § 653(5)(A)(i). Furthermore, the definition of gross income provides that "[i]ncome at the current rate for long-term United States Treasury Bills shall be imputed to *nonincome producing assets* with an aggregate fair market value of $10,000.00 or more." *Id.* (emphasis added).

■ The magistrate declined to impute income to mother for stocks that father contended were performing poorly because he concluded that mother's investments were income producing assets. The family court affirmed. Here, it is undisputed that mother's investments are *income producing assets*. Thus, because the statute only applies to *nonincome producing assets*, father's argument fails. See *Tarrant v. Department of Taxes*, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999) (In determining legislative intent, we begin with plain meaning of statutory language; if legislative intent is clear from language, we enforce statute "according to its terms without resorting to statutory construction."). As a policy matter, father argues that courts should require child support obligors and obligees "to at least make reasonable investments." We disagree. It is not the role of the

judiciary to second guess personal investment decisions or to micromanage investment portfolios. And while we note that, " '[i]n a given set of circumstances, the court may determine that it is appropriate to require a parent to reinvest or liquidate certain assets to provide for his or her children,' " this is not such a case. *Ogborn v. Hilts*, 692 N.Y.S.2d 490, 492 (App. Div. 1999) (quoting *Webb v. Rugg*, 602 N.Y.S.2d 716, 718 (App. Div.1993)).[2]

---

[2] The cases cited by the dissent to support the imputation by the court of a higher rate of return on investments than is maintained by the party are factually distinguished by an underlying obfuscation or deliberate attempt to conceal assets. For example, in *Miller v. Miller*, 734 A.2d 752 (N.J. 1999), husband, a longtime market manager for Merrill Lynch and an "experienced investor," sought a downward modification of his alimony payments. On a net worth of over $6 million, $4.5 million of which was liquid, the trial court granted husband's motion and reduced wife's alimony from $200,000 per year to $48,000. Husband had invested his assets in a manner yielding only 1.6% interest. On appeal, the order was reversed and remanded for recalculation using a method attributing investment earnings at the rate on long-term A-rate corporate bonds. The court noted that "a supporting spouse cannot insulate his or her assets from the alimony calculus by investing those assets in a non-income producing manner." *Id.* at 760. In *Kay v. Kay*, 339 N.E.2d 143 (N.Y. 1975), husband claimed annual income of $28,000 but owned real estate and stock valued at nearly one million dollars. He had attempted to obscure the true amount of his income, deceiving his wife during their marriage as to his true income level, and presenting "complicated testimony at trial in an effort to explain away much of this income as spent on business needs." *Id.* at 145. It was against this factual backdrop that the court held that "if it were necessary for the husband here to utilize his capital or other assets, they would not be exempt from the requirement that he maintain the marital standard of living simply because he voluntarily maintains his finances in a form that limits the income they produce." *Id.* at 146. And, in *Pagar v. Pagar*, 397 N.E.2d 1293, 1297 (Mass. App. Ct. 1980), husband sought a downward modification of alimony and child support payments after investing $49,000 in a yacht from which he subsequently received income of $23 a week as captain. Because of "obscurities" in the husband's expenses listed in his financial statements, and after commenting on the fact that husband was "maintaining his finances in a form that limits the income he receives, twenty-three dollars a week, from an initial $49,000 investment," the court found he had not met his burden and declined to modify his obligation.

The only case cited by dissent involving a trust beneficiary is *In re Dick*, 18 Cal. Rptr. 2d 743 (Ct. App. 1993), in which the husband had transferred more than $20 million in assets to various offshore trusts and corporations, which he placed in the control of others acting for his benefit. The appeals court stated that "[t]he crucial finding was that husband had organized his assets so that he had created 'a labyrinth of trusts and corporations designed by him . . . to shield and protect [him] from creditors' " and to avoid tax liability. *Id.* at 752. The court then looked past the apparent form of ownership to determine the extent of husband's true interest and the availability of those assets in assessing his ability to pay spousal support. *Id.* at 751-52. There is no suggestion in this case that mother has been duplicitous in her arrangements for income.

Next, father argues that the court erred in refusing to impute income to mother for $643,000 worth of stocks in mother's trust that were not producing income at the time of the hearing. According to father, the evidence before the magistrate did not support his or the family court's conclusion that those stocks were income producing assets. However, father concedes that these stocks and the stocks he contends were performing poorly were commingled in one investment account. As we stated above, the facts of this case do not give rise to the circumstances in which a court should evaluate the parties' investment portfolios. To require courts in every case to carefully examine an investment account and determine which stocks are producing income and which are not would be an overly burdensome task.[3]

Father also argues that the court erred in failing to impute income to mother based upon $32,000 in trust-related taxes, legal and accounting fees, and fiduciary fees that are paid out of trust income annually. Under the terms of the trust, mother was entitled to the trust corpus when she reached the age of forty. Because mother is over forty years old, she could elect to have the trust distributed to her. Instead, mother continues to use the executors of the trust to administer the trust, thereby incurring annual fees and expenses. Father contends that because mother chooses to leave the funds in the trust, the fees should be imputed to her as income.

Father's argument appears to be based on a confusion regarding the distinction, for child support obligation purposes, between the income

---

[3] The dissent argues that we should create a presumption imputing a reasonable rate of return on underearning assets in child support cases, rebuttable upon a showing that the parent has a purpose for investing in the underearning assets which benefits the children eligible for support. 172 Vt. at 365, 779 A.2d at 53-54. In the present case, the family court awarded mother all of her inherited wealth, including the trust established by her father, despite father's strong opposition. In the 1993 findings and memorandum of decision, the court concluded:

> The crux of this case is that [father's] obligation to pay maintenance is roughly offset by [mother's] good fortune in inheriting a substantial estate from her family, which will be needed to maintain a standard of living approximately that established during the marriage (and which [father] will continue to enjoy due to his relatively high earning capacity) and provide somewhat for the reasonable needs of Justin for the foreseeable future. So there is no misunderstanding, the court finds that Justin is a child with serious disabilities which probably will require that he receive substantial life time care.

The trial court apparently anticipated plaintiff's ongoing and long-term care obligations for her son.

a trust generates, and the amount of such income that a beneficiary actually realizes. As noted, the governing statute includes "trust income" in the definition of a parent's "gross income." See 15 V.S.A. § 653(5)(A)(i). In construing a statute, " 'our overriding objective must be to effectuate the intent of the Legislature.' " *State v. Dixon*, 169 Vt. 15, 17, 725 A.2d 920, 922 (1999) (quoting *State v. Read*, 165 Vt. 141, 147, 680 A.2d 944, 948 (1996)). In doing so, our first step " 'is to look at the language of the statute itself [because] [w]e presume the Legislature intended the plain, ordinary meaning of the language.' " *Id.* (quoting *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996)). It is clear from a reading of the plain language of the statute that the legislature intended to define income in terms of the parent's income, and not the income generated by a trust.

Father presented no evidence that the amount of taxes and fees paid was unreasonable, or what a reasonable fee would be to manage this particular trust. Accordingly, in determining whether trust income used to pay the costs of administering the trust should be imputed to mother, the only question is whether she was entitled to receive as income the amounts paid by the trustees for administrative costs. The terms of the trust provide the trustees complete discretion over charging these costs of administration either against principal, or against income, and do not provide mother with any control over which source of payment is selected.

At trial, both parties' experts testified that the income mother receives is the net income of the trust, after the costs of administration have been deducted. Were the trustees to pay administrative costs out of principal, leaving the gross income generated by the trust untouched, that entire amount of trust income would be eligible for consideration in calculating mother's child support obligation. The same would be true if she was to invoke her right to have the trust principal distributed to her, as there would then be no restriction on her right to the income generated by the trust assets. These scenarios do not, however, reflect the reality of mother's situation. The amount of trust income she receives is exactly what she is entitled to receive, and what the trust requires to be distributed to her, and no more, in light of the trustees' discretionary election to charge administrative costs to trust income. Therefore, the amount of trust income expended to pay the costs of administration are not imputable to mother as income, and thus are not to be considered in determining her child support obligation. The family court did not abuse its discretion in not attributing the fees to mother as income.

Father next argues that the court erred by refusing to impute income to mother based on the increase in the corpus, or "capital gain" as he characterizes the increase in corpus, of her father's trust. According to father, under 15 V.S.A. § 653(5)(A)(i), the increase in value of the trust corpus should be considered a capital gain. While testimony was presented and the issue was argued before the magistrate, father failed to raise this issue when he appealed to the family court. A review of the required statement of questions to be determined by the family court, see V.R.F.P. 8(g)(3)(B), and the accompanying memorandum shows that father did not argue this question on appeal to the family court. As he failed to raise the issue before the family court, he has waived the right to raise it on appeal to this Court. See *Morais v. Yee*, 162 Vt. 366, 372, 648 A.2d 405, 410 (1994) (arguments not presented before the trial court are not considered by this Court).

■ Finally, father argues that the court erred in imputing $600 per month in income to him based upon the monthly rental value of a cottage in which his employer allows him to live free of charge, and which father occupies approximately fourteen nights a month. On appeal, father contends there was no evidence that staying at the cottage reduces his personal living expenses. See 15 V.S.A. § 653(5)(A)(ii) (gross income includes: "in-kind payments received by a parent in the course of employment . . . if they reduce personal living expenses"). At trial, however, father affirmed that the cottage was an in-kind benefit from his employer which reduced the cost of his living expenses. The testimony of father, and of mother's expert, agreed that the rental value of the cottage was $600 per month. Father stated that he only resided in the cottage because it was offered for free, and if he had to pay to stay there, he would instead stay in a local motel. Thus, but for the housing provided by his employer, father would incur additional monthly personal living expenses. Therefore, it was proper to impute to father the rental value of the property. See *McDaniel v. McDaniel*, 653 So. 2d 1076, 1077 (Fla. Dist. Ct. App. 1995) (under statutory scheme including as gross income for child support purposes in-kind payments to the extent that they reduce living expenses, court properly included on monthly basis the value of company car provided to husband).

*Affirmed.*

**Johnson, J.,** concurring and dissenting. Today, the majority invites parents to shelter their assets from consideration in calculating child

support obligations and allows parents to prioritize payments to their financial advisors — to arrange such shelters — over support for their children. The majority decides that it is "an overly burdensome task" for the courts to follow the legislative mandate to determine the income potential of certain assets owned by parents. 172 Vt. at 356, 779 A.2d at 47. To simplify our job, it holds that, for child support purposes: (1) courts cannot impute income to underearning assets no matter how valuable the assets, nor how little income the assets are earning, (2) contrary to the mandate of 15 V.S.A. § 653(5)(A)(i), courts cannot impute income to nonincome producing assets either when they are commingled with income producing assets in a single investment portfolio, and (3) fees for managing trust investments, no matter how unreasonable, cannot be imputed as income to a beneficiary who voluntarily chooses to have investments managed by trustees. As a result of the majority decision, parents may invest in growth assets — assets that grow in value but produce little or no income — and insulate vast wealth from consideration in determining child support obligations. While these rules indeed simplify our job in calculating child support obligations, I believe they are contrary to Vermont's child support laws and policy, which require child support obligations to reflect the actual means of the parents. I therefore dissent from part II of the majority's decision.

The child support calculation in this case fails to reflect the actual means of mother. Mother does not work for remuneration. She receives income from two trusts, the Douglas E. McWilliams Trust, and the Alison B. Clark Trust, both testamentary trusts established by her father. The most recent valuations of the trusts prior to the trial were from January 31, 1997. On that date the McWilliams trust was valued at $2,655,968 and the Clark trust was valued at $102,492. At the time of the divorce in 1993, mother was entitled to the corpus of the Clark trust, and as of mother's fortieth birthday in 1995, she was entitled to the corpus of the McWilliams trust also. Mother has chosen, however, to keep the corpus in each trust and to continue to have the trusts managed by the trustees selected by her father, at a cost of approximately $32,000 per year.

Father argues that the magistrate erred in determining mother's income because he considered only the income mother reported on her tax returns, which was almost entirely money distributed from the trusts to mother. By this method, averaging mother's income for 1995 and 1996, the magistrate found that mother has annual income of

$113,584, about a 4 percent return on the trusts' investments.[1] Father contends that 4 percent is an unreasonable return when long-term United States Treasury Bills were earning 6.96 percent at the time of the trial. Father presented three methods for calculating mother's income.

The first method is based on the actual growth of the trusts, including both income and capital growth. At the time the parties were divorced on November 30, 1993, the value of the McWilliams trust was $2,259,987. Thirty-eight months later, on January 31, 1997, the trust assets had a value of $2,655,968, an increase in value of $395,981. During the same thirty-eight months, $543,610 was paid from the trust for taxes, administrative fees and commissions, and distributions to mother. Adding the increase in the value of the trust to the amount distributed from the trust ($395,981+$543,610), father's expert concluded that for the thirty-eight month period, the McWilliams trust grew by $939,591, an annualized growth of $296,713 or an annualized rate of growth of about 13 percent.

Father maintains that mother's actual rate of return on the McWilliams trust is 13 percent, not the 4 percent she has been receiving from the trust. Because mother has withdrawn only 4 percent of the return on the trust over the past three years, the trust has grown considerably. Father points out that the magistrate's calculation ignores this substantial capital growth. He contends that the growth of the trusts as well as the income of the trusts should be considered for child support purposes, otherwise mother is insulating a substantial increase in her wealth from the child support calculation. He contends that mother's income should be calculated by multiplying the 13 percent actual rate of return mother has obtained over the past three years by the current value of the trust. Following this method, mother's annual income from the McWilliams trust is $345,276. Performing similar calculations for the Clark trust, father argues that mother earns an additional $11,000 including interest, dividends and growth. Father's first method of calculating mother's income, therefore, produces a total annual income of $356,276.

Second, even if we do not apply the 13 percent actual rate of return mother has had on the McWilliams trust, father contends that the court should, at minimum, impute income to mother at the rate for long-term United States Treasury Bills, 6.96 percent at the time of the

---

[1] The magistrate disregarded some capital losses claimed by mother; thus, the magistrate's finding on mother's income was slightly higher than mother contended at trial.

trial. Father maintains that it is unreasonable to earn less than the treasury-bill rate on investments, and indeed, our child support statute requires courts to impute income to a parent on nonincome producing assets at the long-term treasury bill rate. See 15 V.S.A. § 653(5)(A)(i). At this rate, the $2,655,968 value of the McWilliams trust provides an annual income of $184,855, and the $102,492 value of the Clark trust provides an annual income of $7,133, for a total annual income of $191,988 using father's second method.

Father also presents a third method of calculating mother's income, which does not capture the substantial growth of mother's investments but he claims, nonetheless, produces a more accurate picture of mother's actual means than the method used by the magistrate. He claims that, under 15 V.S.A. § 653(5)(A)(i), the magistrate was required to impute income to mother on $643,000 worth of nonincome producing stocks held in the McWilliams trust. At the 6.96 percent treasury bill rate, prescribed by § 653(5)(A)(i), this produces additional income of $44,753. He also argues that the court should consider the administrative fees of $32,000 annually as income to mother because mother chooses to keep her money in these trusts and therefore chooses to pay these unnecessary and excessive fees. Adding the income imputed to the nonincome producing stocks and the administrative fees to the $113,584 annual income found by the magistrate produces a total income of $190,347 under father's third method of calculation.

## I.

The main issue in this case is whether Vermont courts should impute to parents a reasonable rate of return on capital investments for purposes of determining their child support obligations. The Supreme Court of New Jersey carefully examined the same issue in the context of an alimony case. In *Miller v. Miller*, 734 A.2d 752 (N.J. 1999), the ex-husband received only $137,500 per year in income from his 4.5 million dollar investment portfolio because he invested primarily in growth stock. The ex-wife argued that the ex-husband's decision to invest for capital gains rather than for a larger stream of income did not justify a reduction in her alimony. She maintained that the court should impute income to the ex-husband from the investments in the same way that courts impute income to underemployed supporting spouses. *Id.* at 759. The court agreed: "Given that both income earned through employment and investment income may be considered in a court's calculation of an alimony award,

it follows that there is no functional difference between imputing income to the supporting spouse earned from employment versus that earned from investment." *Id.* at 760. In both instances, the courts may impute income to an underearning asset, either underearning human capital or underearning investment capital. *Id.*

The *Miller* court found that the ex-husband could have invested his substantial assets to yield more than the 1.6 percent rate of return it was earning on his growth stock investments. It concluded that it was therefore "appropriate to impute a reasonable income" from the ex-husband's investments. *Id.* at 761. The court rejected a proposal to impute income at the rate of 12 percent, the average annual growth rate of stocks, because of the risks involved in the stock market. Rather, it concluded that a prudent balance between investment risk and investment return was the rate on long-term A-rated corporate bonds. Thus, it required the trial courts to impute income from underearning investments at the average rate of long-term A-rated corporate bonds over the past five years, 7.7 percent in that case. The court did not require the ex-husband to change his investments; it simply required "the imputation of a more reasonable income from those investments." *Id.*

The rationale in *Miller* applies equally in the context of child support. For example, in *Kay v. Kay*, 339 N.E.2d 143, 145-46 (N.Y. 1975), the Court of Appeals of New York ruled that a father's capital resources, including real estate and growth stock investments, could be considered in determining his support obligation for his ex-wife and children. The court held that the father was not exempt from maintaining alimony and child support at the marital standard of living "simply because he voluntarily maintains his finances in a form that limits the income they produce." *Id.* at 146. It reasoned that the situation was analogous to cases involving unemployed or underemployed supporting spouses, "cases wherein our courts have considered the income a husband is capable of earning by honest efforts, given his education and opportunities." *Id.* The court concluded that the father's resources rather than his net income should be considered in determining what the father could afford for alimony and child support. *Id.*

Although few courts have addressed the issue of underearning assets in the context of a child support case, those that have addressed the issue have imputed income. See, e.g., *Pagar v. Pagar*, 397 N.E.2d 1293, 1297 (Mass. App. Ct. 1980) (reversing decision to reduce father's support obligation where father invested $49,000 in yacht for

chartering business and earned twenty-three dollars per week as boat captain because income potential from business was not adequate to outweigh limited return father was making on investment); *Kay*, 339 N.E.2d at 145-46; see generally Annotation, *Divorce and Separation: Attributing Undisclosed Income to Parent or Spouse for Purposes of Making Child or Spousal Support Award*, 70 A.L.R.4th 173, § 12 (1989 & Supp. 2000). Because Vermont courts consider income from investments and income from employment for child support purposes, it follows that if we impute income to underemployed parents, we should impute income to parents with underearning investments.[2]

## II.

Mother argues, nevertheless, that the magistrate may not impute income to the underearning investments in this case because they are held in a trust, not in her own name. Thus, mother maintains that the form in which the assets are held should be controlling. Although we have not addressed this issue in Vermont, the case law in other states holds that the form in which assets or income is held is not controlling in child support and alimony cases. In such cases, courts have looked beyond the legal entities — corporations and trusts — controlled by parents and supporting spouses to determine the actual means available for support.

For example, courts have imputed income to parents from underearning interests in closely-held corporations. Thus, "[w]hen an obligor is the sole stockholder of a corporation and determines his or her own salary, the corporation's income may be considered in determining the obligor's earning capacity." *Bleth v. Bleth*, 607 N.W.2d 577, 579 (N.D. 2000). Similarly, courts impute income to parents with significant control over earnings of a corporation where the corporation has retained earnings that the parent could have received as salary. *Id.*; see, e.g., *Kelley v. Kelley*, 656 So. 2d 1343, 1345 (Fla. Dist. Ct. App. 1995) (parent cannot avoid child support by being under-compensated by closely-held family corporation); *Merrill v. Merrill*, 587 N.E.2d 188, 191 (Ind. Ct. App. 1992) (retained earnings are profit

---

[2] The majority contends that *Miller*, *Kay* and *Pagar* are distinguishable because in those cases the supporting parent was deliberately attempting to conceal assets. See 172 Vt. at 355 n.2, 779 A.2d at 46 n.2. This fact is simply not relevant to a child support calculation. A child support obligation is based on the actual means of the parents, not on whether the parent is attempting to conceal assets. The amount of the child support obligation is not affected by the parent's failed attempt to conceal assets. The point is to determine the actual means of the parent.

earned by pharmacy, which is solely owned by father, and could properly be considered income to father despite father's choice to roll over profits into business); *Boudreau v. Benitz*, 827 S.W.2d 732, 734 (Mo. Ct. App. 1992) (no error for purposes of child support in attributing to father's income amounts listed as retained earnings on balance sheet for corporation solely owned by father and new wife); *Buley v. Buley*, 530 N.Y.S.2d 697, 698 (App. Div. 1988) (court properly considered factors other than current earnings in determining father's income for child support purposes because father owns own business and could control net draw); see generally Annotation, *Divorce and Separation, supra,* §§ 4-7.

When a parent has an interest in a closely-held corporation, courts pierce the corporate veil to reveal the true sources of income available to the parent to provide support. See, e.g., *Boudreau*, 827 S.W.2d at 734 (where father and new wife owned 100 percent of corporation, trial court did not err in piercing veil of corporation and attributing to father amounts listed as retained earnings and loan from stockholder on corporate balance sheet); see also *Commonwealth ex rel. Maier v. Maier*, 418 A.2d 558, 560-61 (Pa. Super. Ct. 1980) (because ex-husband is sole stockholder of two corporations and determines his own salary, case is appropriate for piercing corporate veil to consider income of corporations in determining ex-husband's earning capacity). In determining whether to impute income to a parent from a closely-held corporation, the central question is whether the parent has control over the income and assets of the corporation. See *Bleth*, 607 N.W.2d at 579.

These cases are directly analogous to the case before us. Mother's true income is veiled by the legal formality of the trust, like the parent who is a sole shareholder of a corporation or the parent who has significant control over corporate earnings in a closely-held corporation. Just as courts have pierced the corporate veil in those cases to examine the income potential of the parent, this Court should pierce the veil of mother's trusts here to accurately examine her income potential. The issue here should not be whether the assets are held in mother's name or in the name of the trust but rather whether the assets are within her control. See also *In re Dick*, 18 Cal. Rptr. 2d 743, 752 (Ct. App. 1993) (affirming trial court award of spousal support based on income imputed to obligor from various off-shore trusts and corporations, although not in obligor's name, in his control). Because mother here has control of the assets in both trusts, this is an appropriate case to impute a reasonable rate of return from her low-

yield investments. The legal formality of the trust should not distract us from acknowledging that all the trusts' assets belong to mother and should be considered in determining the child support obligation.

In sum, just as courts have imputed a reasonable rate of return on underearning investments in alimony cases, and in child support cases have imputed (1) a reasonable income to parents from underearning interests in closely-held corporations, and (2) a reasonable income to underemployed parents, see also 15 V.S.A. § 653(5)(A)(iii) ("gross income" for child support purposes includes potential income of parent who is voluntarily underemployed), I believe there should be a presumption to impute a reasonable rate of return on underearning investments in child support cases.[3] As recommended by the American Law Institute, I would employ a presumption that could be rebutted where the parent can show that there is a purpose for investing in the underearning assets that benefits the children. ALI, Principles of the Law of Family Dissolution: Analysis and Recommendation, Part II § 3.12(4)(b) at 90 (Tentative Draft No. 3) (April 8, 1998) (adopted at the 1998 Annual Meeting). In addition, I would include in the parent's gross income the income potential of an underearning trust where the parent has control over the assets of the trust. To do otherwise creates a shelter for parents to insulate their true wealth from our consideration in determining child support obligations. Cf. *Murray v. Murray*, 716 N.E.2d 288, 294 (Ohio Ct. App. 1999) (if court excluded stock options from gross income, parent "receiving such options would be able to shield a significant portion of his income from the courts, and deprive his children of the standard of living they would otherwise enjoy").

---

[3] My proposal is consistent with the American Law Institute's recommendation to "[i]mpute an ordinary rate of return to an asset that yields less than an ordinary rate of return" in child support cases. ALI, Principles of the Law of Family Dissolution: Analysis and Recommendation, Part II § 3.12(4)(b) at 90 (Tentative Draft No. 3) (April 8, 1998) (adopted at the 1998 Annual Meeting). Under the Institute's recommendations "[a]n ordinary rate of return is the prevailing rate of return for secure investments." *Id.* The Institute explains that the trier of fact should generally impute an ordinary rate of return to a portfolio of growth equities, which produces little or no current income. See *id.* § 3.12 illus. 3. Where, however, the parent owns nonincome producing stock in a closely-held corporation for which she works as a manager, and owning the stock is necessary to maintain her position and influence the business, the trier of fact should not impute income from the stock. *Id.* In such an instance, the mother can rebut the presumption because her investment in the underearning assets benefits the children by improving her employment situation.

## III.

The next issue is to consider the rate of return that courts should impute to underearning assets. I would reject father's proposal to impute income to mother from the trusts at the 13 percent rate — the rate the trusts have been earning in income and capital over the past thirty-eight months — for the same reason that the *Miller* court rejected a proposal to impute income to underearning investment at "the average annual twelve percent growth rate of stocks." 734 A.2d at 761. As the *Miller* court concluded, it would not be equitable to do so "because of the inherent risks involved in stock market investments." *Id.* Indeed, father essentially conceded, before the family court, that the treasury-bill rate was the preferable rate because it was the middle-of-the-road approach and because it provides a clear rule for courts and litigants to follow.

While jurisdictions differ on this issue, I believe that the Vermont Legislature has already determined the treasury-bill rate is the appropriate balance between investment risk and investment return for purposes of imputing income to underearning investments in Vermont. Under 15 V.S.A. § 653(5)(A)(i) courts are required to impute income to a parent on nonincome producing assets at the rate of return for long-term United States Treasury Bills. Thus, our Legislature has concluded that the rate of return for long-term United States Treasury Bills is the reasonable rate of return to impute to underearning assets. Further, I agree with father that the benefit of imputing income at this rate is that it provides a clear rule for courts and litigants to follow that is consistent with our statutory scheme. Finally, this is a fair and reasonable method for imputing income to a parent who chooses to invest in growth, rather than income generating assets, thus becoming "equity rich" while remaining "child support poor." See *Miller*, 734 A.2d at 759 (ex-wife argues that ex-husband's investments in growth stock make him equity rich but alimony poor). While parents may freely choose their investments, courts must develop a method that fairly characterizes a parent's actual means so that the other parent and the children are not burdened as a result of individual choices to invest for future rather than current benefit.

## IV.

The majority rejects my proposal to impute income to underearning assets at the treasury-bill rate for three reasons. First, the majority concludes that it is constrained by the language of 15 V.S.A. § 653(5)(A)(i) from imputing income to assets that are income

producing regardless of how little the assets are earning. See 172 Vt. at 354, 779 A.2d at 45-46. Section 653(5)(A)(i) provides in part: "Income at the current rate for long-term United States Treasury Bills shall be imputed to *nonincome producing assets* with an aggregate fair market value of $10,000.00 or more . . . . " (Emphasis added.) Because mother's growth stocks provide some income, albeit only a 4 percent return, they are not "nonincome producing assets." The majority concludes, therefore, that the statutory language prohibits the court from imputing income to her on these assets at the treasury-bill rate. I disagree.

The statute does not explicitly address how to consider underearning assets. Nonetheless, it is clear from the statute as a whole, and this provision specifically, that the intent of the Legislature is to capture the actual means of parents regardless of how they receive their income or how they hold their assets. See 15 V.S.A. § 653(5). The definition of "gross income" is broadly written and attempts to capture income in whatever form. It begins by defining "gross income" as "income from any source" and then provides a *nonexclusive* list of sources of income that are included in gross income. *Id.* § 653(5)(A)(i) ("income from any source, including, *but not limited to,* income from salaries, wages, commissions, royalties, bonuses, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, prizes, and spousal support actually received") (emphasis added).

The statute attempts to capture potential income by (1) requiring courts to impute income at the current treasury-bill rate "to nonincome producing assets with an aggregate fair market value of $10,000.00 or more"; and (2) requiring courts to impute income to "a parent who is voluntarily unemployed or underemployed." *Id.* § 653(5)(A)(i) & (iii). It also allows courts to look beyond the formality of parties' tax returns by allowing them (1) to include in income "amounts allowable by the Internal Revenue Service for the accelerated component of [business] depreciation expenses"; and (2) to disregard other business expenses as "inappropriate for determining gross income for purposes of calculating child support." *Id.* § 653(5)(A)(iv). The statute clearly tries to capture income and potential income in whatever form to allow courts to calculate the actual means of parents. The distinction the majority makes between nonincome producing assets and underearning assets is not required

by the language of the statute, nor consistent with the overall statutory scheme.

Further, one of the primary purposes of the child support guidelines is to standardize child support orders so that they are predictable. *Grimes v. Grimes*, 159 Vt. 399, 403, 621 A.2d 211, 213 (1992). Thus, no matter how parents hold their assets, similarly situated parents should be treated similarly. Under the majority's construction, parents of similar means would be treated differently. For example, a parent holding 2 million dollars invested in growth stock with a minimal 1.0 percent annual return would be treated as having $20,000 in annual income, while a parent with 2 million dollars invested in a growth stock with no income would have income imputed at the treasury-bill rate and treated as having about $140,000 in annual income, although both parents have the ability to earn the same income and therefore should be treated similarly. The majority provides no rationale for treating nonincome producing assets differently from other underincome producing assets.

The majority's construction is also flawed because it treats wage earners differently from assets owners. While the majority would impute income to an underemployed parent, it would not impute income to a parent from underearning assets. Thus, those who work but not to their full capacity will have income imputed to them as though they worked to their full capacity, while those with assets invested in underearning assets, increasing their capital value, will not have income imputed to them although their assets are not earning income to their full capacity. I can conceive of no reason that the Legislature would choose to treat these two groups differently for the purposes of child support, much less any reason that the Legislature would favor parents who own assets over parents who earn wages.

"The fundamental rule of statutory interpretation is to give effect to the intent of the Legislature." *Roddy v. Roddy*, 168 Vt. 343, 348, 721 A.2d 124, 128 (1998). "This Court construes statutes to avoid absurd results manifestly unintended by the Legislature." *Id.* at 347, 721 A.2d at 128. The majority construes § 653(5)(A)(i) so narrowly that it conflicts with the intent of the Legislature to treat similarly situated parents similarly by imputing income to underemployed parents and imputing income to their underearning assets. Nothing in the language of § 653(5)(A)(i) requires us to create a rule in conflict with the statutory purpose and the related, child-support case law. Indeed, in determining the Legislature's intent, "this Court analyzes not only a statute's language, but also the 'subject matter, its effects and

consequences, and the reason and spirit of the law.' " *Id.* at 348, 721 A.2d at 128 (quoting *In re R.S. Audley, Inc.*, 151 Vt. 513, 517, 562 A.2d 1046, 1049 (1989)). Taking these further factors into consideration requires imputing income to all underearning assets, not just nonincome producing assets.

Second, the majority rejects father's argument that a reasonable rate of return should be imputed to mother's investment assets because "[i]t is not the role of the judiciary to second guess personal investment decisions or to micromanage investment portfolios." 172 Vt. at 354-55, 779 A.2d at 46. I do not suggest that we tell parents how to invest their money. To the contrary, parents may choose to invest their capital as they see fit. Nor do I criticize mother's choice to invest in growth stock to improve her situation in the future. Nonetheless, while a parent may choose to invest primarily in growth stock for her own future benefit, the children and the other parent should not be required to pay now for that benefit. See *Merrill*, 587 N.E.2d at 191 (while father's choice to roll over profits into business may be sound business practice, court will nonetheless impute the profit as income for child support purposes); *Miller*, 734 A.2d at 761 (emphasizing that holding does not require ex-husband to actually invest all capital in long-term corporate bonds; court does not intend to control investment options but to require imputation of a more reasonable income from investments); *Kay*, 339 N.E.2d at 146 (husband is not required to finance support by investing in assets with reasonable return if he is able to meet it by other means but court is not obliged to honor his decision to invest in growth assets for his own future benefit); see also *Murray*, 716 N.E.2d at 293, 299 (choice not to exercise stock options is investment choice father may make but court will impute income because father may not benefit by depriving child of substantial growth in option values).

Third, the majority concludes that it would be overly burdensome for courts to carefully examine investment accounts to determine whether various stocks are income producing or not and whether they are yielding a reasonable rate of return. See 172 Vt. at 356, 779 A.2d at 47. The ex-husband in *Miller* similarly argued that computing the potential yield of his investments was an overly complicated task that should not be undertaken by the courts. 734 A.2d at 757. The court rejected this claim, stating that courts often impute income from different occupations for unemployed or underemployed supporting spouses and that "[t]he calculation of imputed income from investments is equally within our courts' capabilities." *Id.* at 760. I

agree. The task is certainly no more complicated than imputing income to an underemployed parent. In any event, the mere difficulty of the calculation should not be reason to ignore earning potential of parents in child support cases. Cf. *id.* at 760-61 (difficulty in determining value of party's claim is no reason to bar claim). The majority abdicates its responsibility simply because it finds it "an overly burdensome task." 172 Vt. at 356, 779 A.2d at 47.

Moreover, our courts already examine investment accounts to determine the actual annual yield to determine the parents' income. All the difficult determinations are made at this point: (1) which assets produce income and which do not, and (2) how much income do the income-producing assets yield? Having determined the actual yield, the court must simply decide whether the yield is less than or greater than the long-term United States Treasury Bill rate, a rate of return that the court already uses to impute income to nonincome producing assets under our statutory scheme. If the investments yield a greater return, there is no further calculation to do. If the investments yield a lesser return, then the court must multiply the total value of the assets by the treasury-bill rate. Having valued closely-held corporations, imputed income from nonincome producing assets and imputed income to underemployed parents, with the help of experts if necessary, Vermont courts are up to the tasks necessary to ensure fairness in child support orders.

I briefly address three additional issues addressed by the majority. Because I would adopt father's second method for calculating mother's income, I would reject father's third method of imputing income to mother from only nonincome producing stocks and imputing the $32,000 in administrative fees to mother. Father's second method — imputing income from the trusts based on the treasury-bill rate of return on the total value of the two trusts — is a fairer way to calculate mother's income because it captures the income potential of all underearning assets. It is also easier to apply in future cases; the issue is simply whether the rate of return on the total value of all assets reaches the treasury-bill rate, and if not, the same rate of return is imputed to all underearning assets. Nonetheless, I address the nonincome-producing-stock and the administrative-fees issues raised by father's third method because the majority is wrong to fail to take into account in any way the potential income from these two sources.

First, the majority holds that it will not impute income from $643,000 worth of nonincome producing stock in mother's portfolio,

despite the statutory mandate to do so, because it is commingled in one investment account. The majority reasons that it "would be an overly burdensome task" for courts "to carefully examine an investment account and determine which stocks are producing income and which are not." 172 Vt. at 356, 779 A.2d at 47. This holding conflicts with the plain language of § 653(5)(A)(i), which requires the courts to impute income to nonincome producing assets with a value over $10,000. It also conflicts with the purpose of the child support statute by creating a loop-hole for parents to shield their nonincome producing assets from the courts' consideration by commingling them in an account or portfolio with income producing assets. The result is that parents may insulate the bulk of their assets from consideration in a child support proceeding by combining them into one investment portfolio that yields minimal returns, as long as it provides some income, no matter how little.

The task of determining whether a stock produces income is no more burdensome than other tasks that the court undertakes. The income in cases like this — where the parents have income and assets in forms other than simply wages — is often disputed. Frequently, expert testimony is presented, and the court must determine the parents' income as a question of fact, like any other question of fact. Reducing the burden imposed upon the courts to do such fact finding certainly does not justify the inequitable result that the majority proposes here, which is to simply ignore $643,000 worth of stock because it is too difficult to determine whether the stock was producing income or not, even with the help of the expert testimony in this case. I doubt the Legislature intended such a result.

Second, the majority holds that it cannot impute the $32,000 of administrative fees to mother because (1) § 653(5)(A)(i) allows the court to include only the "trust income" to mother, (2) mother receives the net income from the trust after the $32,000 for administrative fees is paid, and (3) it is within the trustees' sole discretion whether to pay these fees from the capital or from the income of the trust. 172 Vt. at 356-57, 779 A.2d at 47-48. Section 653(5)(A)(i), however, in no way limits our consideration to "trust income," as the majority concludes. *Id.* Indeed, the subsection begins by stating that "[g]ross income shall include: (i) *income from any source,* including, *but not limited to* . . . trust income." 15 V.S.A. § 653(5)(A)(i) (emphasis added). Thus, the plain, ordinary meaning of the subsection does not limit us to considering the "trust income."

Father argues that the administrative fees should be imputed as income to mother because they are unnecessary and excessive. He contends that they are unnecessary because the stocks are all "garden variety" held in accounts with well-known brokerage firms. According to father, mother could maintain the same stocks in the same accounts without incurring the $32,000 administrative fees she pays to maintain the trusts. He also contends that the fees are excessive because they are equal to about 28% of mother's income of $113,584 as calculated by the magistrate. Piercing the veil of the trusts, I recognize that mother chooses to keep her assets in these trusts and thus chooses to pay $32,000 for the trustees to manage it. Thus, I agree with father that the magistrate had discretion to impute the $32,000 as income to mother if he found the expense deduction "inappropriate for determining gross income for purposes of calculating child support." *Id.* § 653(5)(A)(iv). Although not technically a business expense under this statutory subsection, mother pays these fees to the trustees to generate income and capital for her; thus, they are analogous to business expenses — as mother concedes in her brief — and should be treated similarly.

Thus, the real issue is whether the fees are reasonable for mother to pay in view of the return that the trustees have generated for her on her capital assets. The answer to this question depends in part on whether mother's annual income is determined to be $113,584, $191,988 or $356,276. While $32,000 appears excessive to generate $113,584 from a trust of over two million dollars, it is somewhat more reasonable to generate $356,276. In any event, father presented no evidence on the reasonableness of the fees. His expert testified that she had no direct knowledge of what a brokerage firm or investment house would charge to manage a portfolio the size of mother's. Consequently, I would hold that in this case it was not appropriate to impute the $32,000 in administrative fees to mother. Nonetheless, upon a proper showing, I believe it is within the magistrate's discretion to find the fees unreasonable and to therefore impute that fee to mother as income, just as other unreasonable expenses may be disregarded by the court.

Finally, the majority holds that father waived the issue of whether the increase in the corpus of the trusts should be considered a "capital gain" to mother because father "failed to raise this issue when he appealed to the family court." 172 Vt. at 358, 779 A.2d at 48. Mother raised this issue at trial in response to father's contention that the court should consider both the income and the capital

growth of mother's trusts to accurately determine her rate of return on the trusts.[4] Both parties' expert witnesses were cross-examined on whether their analysis of mother's income was based on taxable transactions or capital growth that was not taxable. In his proposed findings and conclusions, father argued, based on his expert's testimony, that mother's actual rate of return on the trust was 13 percent. He argued that the magistrate should impute a 13 percent rate of return on the corpus of the trust to calculate mother's income. In the alternative, he argued for the court to apply the treasury-bill rate. These issues were clearly addressed at trial.

They were also addressed on appeal to the family court. In his brief, father argued that the court should impute income to mother because her tax returns did not accurately reflect her means. To support this contention, father listed six factors, including (1) based on her tax returns, mother is earning only 4 percent per year return on a trust valued at over $2,600,000, which is far less than the treasury-bill rate of 6.96 percent, and (2) the actual corpus of the trust is growing at a rate of 19 percent per year. Father maintained that, because the decision not to purchase investments that generate interest and dividends rests entirely within mother's discretion, it was unfair to father not to impute income based on the corpus of the trust. He then argued for the "middle-of-the-road" approach and requested that the court impute income from the trust at the treasury-bill rate.

I agree with the majority that father waived the claim that the court should impute income at a 13 percent rate of return. But the majority confuses two issues: (1) whether income should be imputed to the trust corpus, and (2) if so, at what rate. Father never waived the issue of whether income should be imputed to mother based on

---

[4] To the extent that father addresses the statutory issue of whether capital growth may be considered as a "capital gain," an item listed in § 653(5)(A)(i), he is responding to mother's claim that capital growth cannot be considered in determining mother's income because § 653(5)(A)(i) includes only a realized "capital gain," not capital growth. According to mother, "capital gain" in § 653(5)(A)(i) must be construed consistently with the tax code, and, therefore, includes only realized capital gains, not capital growth. But see 15 V.S.A. § 653(5)(A) (allowing court to disregard business expenses allowed by tax code); *Miller*, 734 A.2d at 759 (rejecting contention that court consider only realized capital gains, as defined by tax code, for alimony purposes); *Murray*, 716 N.E.2d at 299 (holding that magistrate must consider as gross income appreciation in value of stock options that father received from employer although capital gains were not realized); L. Morgan, Child Support Guidelines: Interpretation and Application § 2.03[e][8], at 2-28 (2000) (recent trend is for courts to "treat unexercised stock options, that is unrealized capital gains, as income").

the corpus of the trust. This issue is clearly addressed in his brief. He waived only his claim that the stock-market rate of return is the rate that should be imputed, arguing instead for the treasury-bill rate. The majority is wrong in concluding that father waived his claim that "the court erred by refusing to impute income to mother based on the increase in corpus, or 'capital gain' as he characterizes the increase in corpus, of her father's trust." 172 Vt. at 358, 779 A.2d at 48.

As a result, the majority decision never directly addresses father's main contention here and at trial that the child support order in this case fails to reflect the actual means of mother because it does not take into consideration the substantial capital growth of her two trusts over the past thirty-eight months. Construing § 653(5)(A)(i), the majority concludes that (1) only "trust income" may be included in mother's gross income, (2) the trusts are income producing assets so no income may be imputed from them as "nonincome producing assets," (3) father waived the issue of whether the capital growth should be considered by failing to raise it before the family court. Essentially, the majority reads the list in § 653(5)(A)(i) as an *exclusive* list. It finds nothing in the list that covers "capital growth of a trust"; therefore, it concludes that the capital growth of a trust cannot be considered for child support purposes. This strict construction is completely contrary to the statute; the § 653(5)(A)(i) list is *nonexclusive*. See 15 V.S.A. § 653(5)(A)(i) ("including, but not limited to"). Thus, it should be read broadly to include unlisted sources of income that would be consistent with the purpose of the statute. The majority never undertakes this analysis.

Because the majority construes the child support statute to conflict with both its plain language and its purpose, and thereby creates a shelter for parents — especially wealthy parents — to insulate their income potential from child support calculations, I respectfully dissent. I am authorized to state that Justice Dooley joins in this dissent.