Peter M. Stekr, appellant, v.
Kelly Beecham, formerly
known as Kelly Shannon
Stekr, appellee.

___ N.W.2d ___

Filed September 25, 2015.    No. S-15-003.

1. **Modification of Decree: Child Support: Appeal and Error.** Although an appellate court reviews the modification of child support payments de novo on the record, it affirms the trial court's decision absent an abuse of discretion.
2. **Child Support: Rules of the Supreme Court.** The obligor's non-income-producing assets are relevant to whether application of the Nebraska Child Support Guidelines would be unjust or inappropriate.
3. ____: ____. In determining the amount of child support, courts should not deviate from the Nebraska Child Support Guidelines based on the obligor's equity in his or her residence unless the obligor made an extravagant investment in his or her residence.

Appeal from the District Court for Douglas County: Marlon A. Polk, Judge. Affirmed.

John A. Kinney and Jill M. Mason, of Kinney Law, P.C., L.L.O., for appellant.

Brent M. Kuhn, of Harris Kuhn Law Firm, L.L.P., for appellee.

Heavican, C.J., Wright, Connolly, McCormack, and Miller-Lerman, JJ.

Connolly, J.

## SUMMARY

Peter M. Stekr (Peter) filed a complaint to modify his child support obligation after his income substantially decreased. The trial court dismissed the complaint. It concluded that under the Nebraska Child Support Guidelines, Peter's payments would be substantially reduced. But it decided to deviate from the guidelines in part because Peter owned non-income-producing real estate. On appeal, Peter argues that his non-income-producing assets did not warrant a deviation from the guidelines. We conclude that the trial court did not abuse its discretion.

## BACKGROUND

Peter and Kelly Beecham, formerly known as Kelly Shannon Stekr (Kelly), divorced in 2001. The court granted Kelly custody of the parties' minor daughter and ordered Peter to pay child support of $985.84 per month. In 2007, the court raised Peter's child support obligation to $1,801.51 per month.

In January 2010, Peter filed a complaint to modify the child support order because his income had decreased. The court referred the case to a referee, who held a hearing in August.

At the hearing, Peter testified that he had traded and sold bonds and mortgage-backed securities since 1993. He worked for a securities company for about 5 years, during which time he had the ability to earn substantial commissions. Peter's adjusted gross income was $129,057 in 2007, $331,354 in 2008, and $345,689 in 2009.

The securities company laid Peter off in February 2010. He found another job trading securities with an annual salary of $60,000 and a bonus of up to 5 percent of his salary.

Peter testified that he is the sole shareholder of Golden Asset Management, which has one asset: a "spec home" in Denver, Colorado. Peter built the house in 2007 "to sell it and make money," but this proved difficult. He listed the house

for $950,000, then $880,000, then $825,000, and finally, as of the hearing, $799,000. Peter testified that the mortgage on the Denver house was $690,000 and that he had personally been making the monthly payments of $2,400 to $2,600 since 2007. No one has ever rented or lived in the house.

Peter personally owns two other houses. One is in Golden, Colorado, and is Peter's residence. The Golden house is not subject to any debt and was valued at $500,000 for tax purposes. But Peter thought that it was worth only $450,000.

The other house is in Bennington, Nebraska. The Bennington house is not subject to any debt and was valued at $525,000 for tax purposes. But Peter thought that it was worth only $400,000.

Kelly lives in Omaha, Nebraska, with her husband of 8 years. Kelly is not employed outside the home, but she testified that she has an earning capacity of $4,750 per month.

After hearing arguments from both parties, the referee stated that "[o]ne of the things that caught my attention is that [Peter] appears to be paying a mortgage of 24 to 26 hundred dollars a month on his house." The referee reasoned that the money was "coming from somewhere" and said that "[i]f he's got access to that money, I want to know why that money isn't going to the kid . . . ." The referee sustained Peter's motion to reopen the record, and Peter's attorney recalled him as a witness.

Peter testified that he had made the mortgage payments on the Denver house "through my savings, which are [now] non-existent." He explained that he saved money during his profitable years and had accumulated an undefined amount of "savings" and "about $100,000.00 in cash at home." Asked if he was now paying the mortgage from his $5,000 monthly salary, Peter said that "[i]t's kind of like a shuffle game. One thing to the other. You pay one bill and then the other, you know, savings . . . ."

The referee recommended that the court dismiss Peter's complaint. He explained that Peter might be entitled to a

modification under the guidelines, but that the case was "outside the normal financial framework" because of Peter's real estate holdings.

In October 2010, the court overruled Peter's exception to the referee's report. The court stated that the evidence of Peter's "significant real estate holdings and his willingness to spend his savings and borrow monies to protect his financial situation" supported the referee's conclusion.

A series of three appeals by Peter and three remands by the Nebraska Court of Appeals followed the October 2010 order. The Court of Appeals remanded the cause first because the district court failed to attach a child support worksheet to its order and then because the district court failed to comply with the Court of Appeals' mandates. As is relevant here, in Peter's first appeal, the Court of Appeals concluded that "the district court essentially found that Peter's decrease in income was a material change in circumstances warranting a reduction in child support under the guidelines, but further found that a deviation from the guidelines was justified."[1] In Peter's third appeal, case No. A-13-398, an unpublished memorandum opinion filed May 13, 2014, the Court of Appeals said that its construction of the district court's October 2010 order (i.e., a modification was warranted under the guidelines but the court decided to deviate from them) had become the law of the case.

In December 2014, the district court entered a responsive order to the Court of Appeals' third mandate. The district court stated that the worksheet 1 submitted by Peter, and attached to the order, showed how much support Peter owed under the guidelines. According to the worksheet, both Peter and Kelly had total monthly incomes of $5,000 and Peter's share of the support obligation was $647.51 per month. So, the court explained that under "a strict application of [the]

---

[1] *Stekr v. Beecham*, No. A-10-1047, 2011 WL 4635141 at *3 (Neb. App. Sept. 27, 2011) (selected for posting to court Web site).

Nebraska Child Support Guidelines," Peter would owe $647.51 per month.

But the court decided to deviate from the guidelines because Peter had "a large sum of money available from all sources including but not limited to substantial real estate holdings, . . . and for the reason that [Peter] has had savings . . . and an undisclosed amount of other funds to pay on the mortgage for his real estate." The court ordered Peter to pay $1,801 per month "based upon the relative financial circumstances of the parties and history of established support for the minor child."

## ASSIGNMENTS OF ERROR

Peter assigns and argues that the court erred by deviating from the Nebraska Child Support Guidelines.

Peter assigns several other issues but does not specifically argue them, other than to say that they "flow from" the court's decision to deviate from the guidelines.[2] To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the party's brief.[3] We do not consider the errors that Peter assigned but did not argue.

## STANDARD OF REVIEW

[1] Although we review the modification of child support payments de novo on the record, we affirm the trial court's decision absent an abuse of discretion.[4]

## ANALYSIS

Peter and Kelly disagree about the relevance of Peter's assets to his child support obligation. Peter argues that his ownership of non-income-producing real estate was not a basis to deviate from the Nebraska Child Support Guidelines.

---

[2] Brief for appellant at 11.

[3] *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015).

[4] See *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013).

Kelly notes that Peter chose to invest his money in non-income-producing real estate.

We have stated that trial courts may consider the circumstances of the parties in determining the amount of child support.[5] The parties' circumstances includes their financial condition.[6] Other courts have recognized that the parties' assets—including those that are not currently producing income—are relevant to the support calculation.[7]

Courts generally factor non-income-producing assets into the child support calculation in one of two ways.[8] First, courts sometimes impute to the parent's income a hypothetical reasonable rate of return from a nonproducing or underproducing asset.[9] The rationale is that funds devoted to unproductive assets have untapped earning potential.[10] Courts do not have to defer to a parent's investment decisions, and the parent's choice to devote resources to growth instead of income must sometimes yield to the child's best interests.[11]

The second way courts consider non-income-producing assets is as a reason to deviate from the presumptive child

---

[5] *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015).

[6] *Id.*

[7] See, e.g., *Adam v. Adam*, 624 A.2d 1093 (R.I. 1993). But see *Sutherland v. Sutherland*, 14 Va. App. 42, 414 S.E.2d 617 (1992).

[8] See *In re Marriage of Berger*, 170 Cal. App. 4th 1070, 88 Cal. Rptr. 3d 766 (2009).

[9] See, e.g., *In re Marriage of Williams*, 150 Cal. App. 4th 1221, 58 Cal. Rptr. 3d 877 (2007). See, also, American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 3.14(4)(b) (2002). But see *Clark v. Clark*, 172 Vt. 351, 779 A.2d 42 (2001).

[10] See, *Weinstein v. Weinstein*, 280 Conn. 764, 911 A.2d 1077 (2007); *In re Marriage of Williams, supra* note 9; *Kay v. Kay*, 37 N.Y.2d 632, 339 N.E.2d 143, 376 N.Y.S.2d 443 (1975).

[11] See, *In re Marriage of Schlafly*, 149 Cal. App. 4th 747, 57 Cal. Rptr. 3d 274 (2007); *Weinstein v. Weinstein, supra* note 10; *In re Marriage of Destein*, 91 Cal. App. 4th 1385, 111 Cal. Rptr. 2d 487 (2001); American Law Institute, *supra* note 9, § 3.14, comment *a*. But see *Barton v. Hirshberg*, 137 Md. App. 1, 767 A.2d 874 (Md. Spec. App. 2001).

support formula.[12] For deviations, the theory is that parents should sometimes liquidate assets to meet their paramount obligation to support their children.[13] Relevant factors include the obligor's total wealth, the custodial parent's total wealth, the children's needs, and whether liquidating the asset would interfere with the obligor's livelihood or ability to earn income.[14]

Here, the district court deviated from the guidelines. It found that Peter's obligation under the guidelines would be $647.51 per month, but that he should instead pay $1,801 per month because of the parties' financial circumstances.

We must answer two questions: (1) Are an obligor's non-income-producing assets relevant to whether the circumstances justify a deviation from the guidelines? (2) If so, did the district court abuse its discretion by deviating from the guidelines?

[2] As to the first question, we conclude that a court may consider the obligor's non-income-producing assets in determining whether to deviate from the guidelines. Courts have the discretion to depart from the guidelines if their application would be unjust or inappropriate.[15] The obligor's resources are relevant to the justness and appropriateness of the guidelines.

So, we turn to whether Peter's resources made the application of the guidelines unjust or inappropriate. According to the court, Peter had "substantial real estate holdings." The

---

[12] See, e.g., *Cody v. Evans-Cody*, 291 A.D.2d 27, 735 N.Y.S.2d 181 (2001). But see *Barton v. Hirshberg, supra* note 11.

[13] See *Cody v. Evans-Cody, supra* note 12. See, also, *Clark v. Clark, supra* note 9; *Green v. Green*, 447 N.E.2d 605 (Ind. App. 1983).

[14] See, *Jurado v. Jurado*, 119 N.M. 522, 892 P.2d 969 (N.M. App. 1995); *Linard v. Hershey*, 489 N.W.2d 599 (S.D. 1992); *Quaid v. Quaid*, 403 N.W.2d 904 (Minn. App. 1987). See, also, *Anthony v. Anthony*, 21 Mass. App. 299, 486 N.E.2d 773 (1985); American Law Institute, *supra* note 9, § 3.14, comment *d*.

[15] Neb. Ct. R. § 4-203(E) (rev. 2011).

court also found that Peter "has had savings . . . and an undisclosed amount of other funds to pay on the mortgage for his real estate."

We note that Golden Asset Management owns the house in Denver, and not Peter. But he has not argued that the corporate ownership is relevant, and we do not address that issue. More pertinent to our analysis is that the record does not show how much equity, if any, Peter has in the Denver house. Peter initially listed the house for $950,000 but reduced the listing price several times to its current level of $799,000. The plummeting listing price was approaching the $690,000 mortgage, and Peter's ability to sell the house at the reduced price was far from certain. On these facts, the court could not assume that the difference between the most recent listing price and the outstanding debt was the measure of Peter's equity.

[3] Nor is Peter's ownership of his personal residence in Golden a basis to deviate from the guidelines. Courts have been reluctant to impute income from an obligor's home equity.[16] For example, the American Law Institute suggests that courts should not impute income from a parent's residence if the investment is "commensurate with the parent's economic resources."[17] Similarly, we believe that obligors should not ordinarily have to mortgage their homes or live in their cars in order to pay child support that is above the guidelines. The record does not suggest that Peter made an extravagant investment in his home.

But Peter also owned a house in Bennington. Peter testified that the Bennington house was assessed for tax purposes at $525,000 and was not encumbered by a mortgage. Even if the house was worth only $400,000, as Peter thought, he still has $400,000 of equity in real estate other than his home. Peter's

---

[16] See *In re Marriage of Henry*, 126 Cal. App. 4th 111, 23 Cal. Rptr. 3d 707 (2005). See, also, Vt. Stat. Ann. tit. 15, § 653(5)(A) (Cum. Supp. 2014).

[17] American Law Institute, *supra* note 9, § 3.14(4)(b) at 583 & comment *d*.

equity in the Bennington house was relevant to the appropriateness of a deviation.

Furthermore, the court found that Peter had "an undisclosed amount of other funds to pay on the mortgage for his real estate," which he should instead use to support his daughter. So, the court decided that Peter's protestations of imminent bankruptcy were not credible. Although our review is de novo, we may still give weight to the fact that the trial court observed the witnesses and accepted one version of the facts instead of another.[18] This rule is particularly apt for issues of credibility.[19]

We conclude that the district court did not abuse its discretion by deviating from the guidelines because of Peter's financial resources, including his equity in non-income-producing real estate. The guidelines do not incorporate the obligor's non-income-producing assets into the child support formula, and courts should not require obligors to liquidate such assets as a matter of course. But the best interests of the child are the paramount concern,[20] and sometimes the preservation of assets must yield to the child's needs.

## CONCLUSION

We conclude that the district court did not abuse its discretion by deviating from the guidelines. The court could find that Peter's financial resources, including his non-income-producing real estate, made the application of the guidelines unjust or inappropriate.

Affirmed.

Cassel, J., not participating.

---

[18] See *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015).

[19] See *id.*

[20] *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009).